**AFFIRM; and Opinion Filed August 29, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00902-CV

## TEN HAGEN EXCAVATING, INC., Appellant
## V.
## JOSE CASTRO-LOPEZ AND LORENA CASTRO, Appellees

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. CC-11-00454-A**

## OPINION

Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Lang-Miers

This is a personal injury case arising from a traffic accident. Appellees Jose Castro-Lopez and his daughter Lorena Castro (the Castros) were two of the plaintiffs and appellant Ten Hagen Excavating, Inc. was one of two defendants. After a week-long jury trial in which liability and damages were contested, both issues were resolved against Ten Hagen. In short, Ten Hagen was found vicariously liable for the negligence of the driver who caused the accident (the other defendant). The jury also found that the Castros each suffered certain categories of compensable damages as a result of the accident, including past physical pain and mental anguish, and past medical care expenses. Based on the jury's verdict, the trial court rendered judgment against Ten Hagen and the driver, jointly and severally, and ordered them to pay the Castros a total of $916,262.35.

Stated succinctly, Ten Hagen argues on appeal that the judgment should be reversed and a take-nothing judgment should be rendered in its favor for three independent reasons. First, Ten Hagen argues that it is not vicariously liable for the driver's negligence because, contrary to the trial court's partial directed verdict, Ten Hagen was not the driver's "statutory employer" under applicable safety regulations. Second, Ten Hagen argues that even if it was the driver's employer, it did not owe a legal duty to the Castros because the driver was not acting in the scope of his employment at the time of the accident. Third, Ten Hagen argues that objective physical evidence proves that the driver's negligence did not cause the accident.

In the alternative, Ten Hagen argues that we should reverse the judgment in part and render a reduced judgment because the evidence is legally insufficient to support the findings as to Lorena Castro's damages. And as a final alternative, Ten Hagen argues that we should reverse the judgment and remand this case for a new trial because the trial court erred by excluding the testimony of its rebuttal medical expert concerning the reasonableness and necessity of the Castros' past medical expenses.

We resolve these issues against Ten Hagen and affirm the trial court's judgment.[1]

BACKGROUND

**The Accident**[2]

The traffic accident giving rise to this case happened on Interstate 30 around 2 p.m. on November 11, 2010. The accident drew media attention because it caused a pileup that shut down traffic in both directions on the Trinity River Bridge just west of downtown Dallas:

---

[1] Ten Hagen also raises another alternative argument that we should reverse and remand for a new trial if we conclude that the issue of whether it was a statutory or common law employer presented a fact question. Because of our disposition of the first issue, we do not need to address this alternative argument.

[2] The accident-related photographs were introduced into evidence during trial by Ten Hagen as part of a 238-page compendium exhibit of photographs marked as Defendant's Exhibit 479.



The Dallas County Sheriff's Department investigated the accident and concluded that it was caused by Buddy Lloyd Ross II—the driver of this 18-wheeler (a tractor pulling an open round-bottom trailer, with Ten Hagen's name and motor carrier number on it):



There was conflicting testimony about the accident (as described in detail below). But it is undisputed that the accident began when the 18-wheeler and a cement truck somehow collided while traveling in the westbound lanes of Interstate 30. After they collided, both vehicles veered left toward the center guard rail. The cement truck crossed over the guard rail, rolled onto its side, and landed in the left eastbound lane, hitting other vehicles—including the Castros' vehicle.

The cement truck's barrel detached and rolled into the center eastbound lane. The front of the 18-wheeler also crossed over the guard rail and landed partially in the left eastbound lane.

**The Castros' Claims**

The Castros intervened as additional plaintiffs in a lawsuit filed against Ross and Ten Hagen by multiple other plaintiffs, including the cement truck driver. In their third and final amended petition in intervention, the Castros alleged that Ross's negligence caused the accident, and that Ten Hagen was vicariously liable for Ross's negligence because Ten Hagen was Ross's employer under common law or statutory law (namely, "Federal Motor Carrier Safety Regulations and the Texas Transportation Code") and because Ross was acting in the course and scope of his employment at the time of the accident. The Castros also asserted a claim for gross negligence against Ross and Ten Hagen, and claims against Ten Hagen for negligent hiring, negligent retention, negligent entrustment, and negligent supervision.

**The Trial**

The Castros' claims against Ross and Ten Hagen were tried to a jury along with the claims of Carlos Martinez, the cement truck driver. Lorena sought damages for past physical pain and mental anguish and past medical expenses. Jose sought damages for past and future physical pain and mental anguish, past and future loss of earning capacity, past and future disfigurement, past and future physical impairment, and past and future medical expenses. Ross did not appear at trial and Ten Hagen alone defended against the Castros' claims.

Several facts were undisputed at trial. For example, as to the 18-wheeler bearing Ten Hagen's name and motor carrier number, it was undisputed that Ross owned the tractor and Ten Hagen owned the trailer. In addition, although it is unclear who added them and exactly when they were added, it was also undisputed that, before the accident, Ten Hagen knew its name and motor carrier number were on the tractor.

The disputed issues at trial included whether, under common law, Ross's employment relationship with Ten Hagen was more in the nature of an employee or an independent contractor. In addition, Ten Hagen also disputed the Castros' evidence that Ross was acting in the scope of his employment at the time of the accident; that Ross caused the accident; and that the accident proximately caused the damages alleged by the Castros. Ten Hagen attempted to dispute whether the Castros' past medical expenses were reasonable and necessary, but the trial court excluded the testimony of Ten Hagen's expert on this issue because the court had previously granted a motion to strike the expert's pretrial affidavits on the same issue.

The plaintiffs each testified about the accident and their injuries. In addition, they presented testimony from nine other witnesses before resting their case. Six witnesses testified in person: (1) Ten Hagen's president, (2) the deputy sheriff who investigated the accident, (3) the passenger in the cement truck, (4) a vocational rehabilitation expert, (5) an orthopedic surgeon, and (6) an expert on the issue of motor carriers and the safety regulations that apply to them. The plaintiffs also offered into evidence deposition testimony from Ross and two other eyewitnesses.

After the plaintiffs rested their case, Ten Hagen presented testimony from five witnesses. Four witnesses testified in person: (1) Ten Hagen's president, (2) the Ten Hagen employee who gave Ross Ten Hagen stickers to put on his tractor, (3) an accident-reconstruction expert, and (4) a rebuttal vocational rehabilitation expert. Ten Hagen also offered into evidence deposition testimony from a rebuttal medical expert on the issue of whether the plaintiffs' alleged injuries were caused by the accident.

After both sides rested, Ten Hagen and the Castros made cross-motions for directed verdicts on an issue related to Ten Hagen's vicarious liability for Ross's alleged negligence. More specifically, focusing on the arrangement between Ten Hagen and Ross, and relying on

–5–

factors set forth in *Sharpless v. Sim*, 209 S.W.3d 825 (Tex. App.—Dallas 2006, pet. denied), and *Martinez v. Hays Construction, Inc.*, 355 S.W.3d 170 (Tex. App.—Houston [1st Dist.] 2011, no pet.), the Castros argued that for purposes of motor carrier liability under federal and state safety regulations, Ten Hagen was deemed to be Ross's "statutory employer" (i.e., deemed to be the motor carrier that operated the 18-wheeler) as a matter of law. In response, Ten Hagen argued that *Sharpless* and *Martinez* did not apply. Ten Hagen argued that under applicable safety regulations, a motor carrier has to be "acting as a motor carrier in order to be in the position of a statutory employer," and at the time of the accident it was instead in the position of a "shipper"—like someone who "hire[s] FedEx to ship something for us." Based on this argument, Ten Hagen moved for a directed verdict on the "whole case" on several grounds, including on the ground that it was "acting as a shipper, and a shipper has no duty to comply with the Federal Motor Carrier Safety Regulations or the Texas Motor Carrier Safety Regulations."

The trial court granted the Castros' motion and agreed to include the following instruction in the jury charge:

> **"Statutory Employer/Employee"**
>
> You are instructed that, at the time of the collision in question, Buddy Lloyd Ross II was a statutory employee of Ten Hagen Excavating, Inc., and Ten Hagen Excavating, Inc. was Buddy Lloyd Ross II's statutory employer under the Federal and Texas Motor Carrier Safety Regulations as a matter of law.

As a result of this instruction, the Castros agreed to "withdraw any request for a common law employee instruction, definition, or charge." Before the case was submitted to the jury, the plaintiffs also withdrew most of their claims except for the negligence claim against Ross and the related issue of Ten Hagen's vicarious liability for Ross's negligence.

Six questions were submitted to the jury: whether "the negligence, if any" of Ross and/or Martinez proximately caused the accident; the percentages of responsibility attributable to Ross

and Martinez (if the jury concluded that both were at fault); whether Ross was "acting in the scope of his employment" at the time of the accident; and the amount of each plaintiff's damages. The jury rendered a unanimous verdict in response to these questions. The jury found that Ross's negligence was the sole proximate cause of the accident[3] and that Ross was acting in the scope of his employment at the time. The jury awarded Jose a total of $658,959.38 in damages. And the jury awarded Lorena a total of $160,911.13 in damages—$150,000 for past physical pain and mental anguish, and $10,911.13 for past medical expenses.

After the jury's verdict, the trial court severed the claims of other plaintiffs, including Martinez. As to the Castros' claims, the trial court rendered judgment on the jury's verdict against Ten Hagen and Ross, jointly and severally, for a total of $916,262.35 (which includes the Castros' damages, prejudgment interest on actual damages, and court costs), plus post-judgment interest. Ten Hagen filed a motion for judgment notwithstanding the verdict on the issue of whether Ross was a statutory employee. The motion was overruled by operation of law.

STATUTORY EMPLOYMENT ISSUE

In its first issue Ten Hagen argues that it cannot be vicariously liable for Ross's negligence (i.e., that it owed no duty to the Castros) because it was not Ross's statutory employer under Texas Motor Carrier Safety Regulations.[4] In other words, Ten Hagen challenges the trial court's decisions to deny Ten Hagen's motion for directed verdict, grant the Castros' motion for partial directed verdict, and instruct the jury that Ten Hagen was Ross's statutory employer.

---

[3] Although the jury was instructed not to answer the question concerning percentages of responsibility unless they found that both Ross and Martinez caused the accident, the jury nevertheless answered that question and attributed 100% of the responsibility to Ross and 0% to Martinez.

[4] The Texas Supreme Court recently clarified that Federal Motor Carrier Safety Regulations apply only in cases involving the transportation of property across state lines. *See Gonzalez v. Ramirez*, 463 S.W.3d 499, 502–03 (Tex. 2015) (per curiam). Because there is no evidence in this case of transportation across state lines, we apply Texas regulations.

–7–

**Standard of Review**

In analyzing a directed verdict, we apply the same standard of review applicable to summary judgments. *See AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 667 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). When both sides move for summary judgment as a matter of law and the trial court grants one motion and denies the other, we review all of the evidence and render the decision that the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

**Applicable Law**

Motor carrier safety regulations are designed to protect the public from the risks associated with the operation of commercial motor vehicles.[5] Among other things, motor carrier safety regulations ensure that a commercial motor vehicle is safely maintained and operated, prevent confusion about which party bears ultimate financial responsibility in the event of an accident, and ensure that injured parties are compensated.[6] For example, in Texas:

- a commercial motor vehicle and its driver must meet certain safety standards;[7]

---

[5] In a case involving interstate commerce and certain federal regulations, for example, our sister court explained that the regulations were designed to protect against attempts by motor carriers to shield themselves from liability for negligent drivers:

> During the first half of the twentieth century, interstate motor carriers attempted to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying the drivers who operated the trucks as "independent contractors." In order to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators, Congress in 1956 amended the Interstate Common Carrier Act to require interstate motor carriers to assume full direction and control of the vehicles that they leased "as if they were the owners of such vehicles." The purpose of the amendments to the Act was to ensure that *interstate motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants.*

*Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 37–38 (Tex. App.—Fort Worth 2002, no pet.) (emphasis added).

[6] *See generally id.*; 37 TEX. ADMIN. CODE § 4.11(a).

[7] *See generally* 37 TEX. ADMIN. CODE § 4.11(a) (incorporating by reference numerous Federal Motor Carrier Safety Regulations), *see also* 49 C.F.R. §§ 391.13, 392.1, 393.1, 396.1; TEX. TRANSP. CODE ANN. §§ 644.001–.252; 647.001–.019.

- each side of the power unit must display the name of the owner or operator and show the motor carrier registration number;[8] and

- the owner or operator has to carry at least a certain amount of liability insurance.[9]

Under Texas Motor Carrier Safety Regulations, when a negligent driver of a commercial motor vehicle causes an accident, ultimate financial responsibility lies with the party determined to be the "motor carrier" at the time of the accident. *See generally Gonzalez v. Ramirez*, 463 S.W.3d 499, 502–03 (Tex. 2015) (per curiam) ("The Texas Regulations apply to 'commercial motor vehicles' and hold 'motor carriers' responsible for their 'employees.'"). As a result, courts and parties sometimes use the term "statutory employer" when referring to the motor carrier. *See, e.g.*, *id.* at 503. Under Texas safety regulations, a "motor carrier" is the individual or entity "that controls, operates, or directs the operation of one or more vehicles that transport persons or cargo over a road or highway in this state." TEX. TRANSP. CODE ANN. § 641.001 (West 2011). In determining whether a particular defendant is deemed to be the "motor carrier" with respect to a particular accident, the fact that the defendant is generally authorized to operate as a motor carrier is irrelevant. *See Gonzalez*, 463 S.W.3d at 504. Instead, we focus on the facts of the specific transaction at issue. *Id.*

**Additional Background Facts**

Ten Hagen's president, Scott Ten Hagen, testified that his company does "on-site excavation" at construction sites. That work frequently requires Ten Hagen to add and remove dirt and other materials. To move those materials, Ten Hagen hires independent contractors, including Ross. The other independent contractors that Ten Hagen uses are bigger companies— Dirt Trucking, DFW Aggregates, Cowboy Trucking, and Alliance Trucking. When Ross hauled

---

[8] *See* TEX. TRANSP. CODE ANN. § 642.002(a).

[9] *See id.* § 643.101.

for Ten Hagen, Ross drove his own tractor and used a Ten Hagen trailer. When possible, Ten Hagen preferred to use Ross because it was more convenient and less expensive.[10] Ross worked exclusively for Ten Hagen from 2004 until this accident in 2010.

Three witnesses testified about the circumstances surrounding the fact that Ten Hagen's name and motor carrier number were on the side of Ross's tractor at the time of the accident. Although their testimony was somewhat conflicting as to certain details, it is undisputed that Ten Hagen knew that the 18-wheeler was impounded approximately two months before the accident because it did not properly identify the owner or operator, and after that Ten Hagen gave Ross stickers to put on the tractor.[11]

---

[10] According to Scott, Ten Hagen paid other independent contractors $70 per hour but paid Ross a "discounted hourly rate" of $50 per hour in exchange for his use of Ten Hagen's trailer. In addition, by hiring Ross, Ten Hagen skipped the middleman and dealt directly with the driver:

> The bigger companies are a little more inconvenient. You have to go through a salesman. And then you have to go—and then you got to go through dispatch. Then dispatch has to do a—dispatch a truck, and you may get a different truck every day. So sometimes it's more convenient to deal with a guy with one or two trucks. But, of course, he can't handle a job that may need a thousand, you know, loads of dirt on it.

> . . .

> Well, the little guy, you're—you're dealing with the owner, the driver, the guy that does the billing, you know. So it's more one on one so you can have him pick up odd loads more—wow, I don't know what I'm trying—like a special load if you just need one load where it's way more inconvenient to call Alliance and—and you got to get a quote. You've got to do a bunch of paperwork before that truck can be dispatched to go get one load.

[11] Ross testified that he was hauling a load for Ten Hagen in August 2010 when he "got pulled over for no tarp." The deputy sheriff told Ross that the truck was being impounded because it "had to have signs on it and all that stuff." In other words, the truck "had to have a motor carrier's identification." Scott went to where the truck was impounded, and after that, the truck was towed to Ten Hagen's yard and a Ten Hagen mechanic added Ten Hagen's name. Ross testified that he did not recall exactly when Ten Hagen's motor carrier number was added, but he knew he did not put it on the truck.

Scott testified that Ten Hagen's name was on the truck "for some time." With respect to the motor carrier number, he testified that he knew the number was on there but Ross was supposed to remove it and "[e]vidently he failed to." Scott acknowledged that the name and motor carrier number indicated that Ten Hagen was operating the 18-wheeler:

> Q. Now, the MCR number identifies for the highway patrol and other authorities whose authority the truck is operating under, correct?
>
> A. Correct.
>
> Q. So with your number on that truck on the day of the collision, that's telling the authorities, at least, that that truck is operating under your authority, correct?
>
> A. I would say so.
>
> . . .
>
> Q. Well, you certainly saw the logo on the side of the truck?
>
> A. Well, the logo had been on the truck for a while. I didn't have a problem with that one.
>
> Q. So—and to the world he's saying this is a Ten Hagen Excavating truck?
>
> A. I would say, yes.

Finally, Andy Bolton, Ten Hagen's mechanic, testified that he gave Ross one sticker for each side of his truck. But according to Bolton, Ross applied the stickers himself.

–10–

**Analysis**

Ten Hagen argues that the material facts in this case establish that it was not a motor carrier as a matter of law. To support its argument Ten Hagen primarily relies on *Gonzalez* and *Harris v. Velichkov*, 860 F. Supp. 2d 970 (D. Neb. 2012).

First, Ten Hagen contends that the supreme court's "recent decision in *Gonzalez* mandates the conclusion that Ten Hagen is not a motor carrier and therefore is not Ross's statutory employer." Ten Hagen acknowledges that the Texas Motor Carrier Safety Regulations "create a 'statutory employment' relationship in which a motor carrier is deemed to be liable for the negligence of its 'statutory employees'" and that a statutory employee "may include individuals who would be characterized as 'independent contractors' at common law." But it contends that to be a motor carrier the defendant had to exercise control over "the actual *transportation* of the property" and there was no evidence of that control here because Ten Hagen:

- contracted with independent contractors (like Ross) on an as-needed basis to transport loads; and

- controlled only the loading site and identified delivery locations for the hauls;

  *but*

- did not control which driver operated a particular truck or what route the drivers took; and

- was not responsible for providing the hauling permit under which the drivers (like Ross) operated.

Ten Hagen argues that these "controlling factors" prove that it "was not a motor carrier as a matter of law." We disagree.

In *Gonzalez*, the defendant, Cuahutemoc ("Tim") Gonzalez, was hired by a farm to harvest the farm's silage and haul it to a feed yard. *Gonzalez*, 463 S.W.3d at 501. Gonzalez did

–11–

the harvesting, but hired other companies to transport the silage to the feed yard. *Id.* One of those companies was 3R/Garcia Trucking, which, in turn, hired drivers, including Raymond Ramirez, to haul the silage to the feed yard. *Id.* As Ramirez was hauling his load to the feed yard, a tire on his truck blew out. He lost control of the vehicle and struck and killed two people in another vehicle. *Id.* A representative of the estate of one of the deceased individuals sued Gonzalez seeking to "hold him vicariously liable for the actions of Garcia and Ramirez based on Gonzalez's alleged status as a motor carrier." *Id.* The trial court granted no-evidence summary judgment in favor of Gonzalez, and the plaintiff appealed. A divided court of appeals reversed, concluding that "fact issues exist as to Gonzalez's status as a motor carrier and employer under the Texas Regulations." *Id.* at 503. Gonzalez appealed to the supreme court, which examined the facts surrounding the accident and concluded that Gonzalez was not a motor carrier at the time of the accident. *Id.* at 504. The court looked at "the facts that directly implicated control of the actual *transportation* of the property" and concluded they were absent. *Id.* at 505 ("In analyzing whether a defendant is a motor carrier, we focus on the specific transaction at issue.").

Second, Ten Hagen relies on *Harris*, which the *Gonzalez* court described as "instructive." *See Gonzalez*, 463 S.W.3d at 505 ("Although the district court in [*Harris*] analyzed motor-carrier status under Federal Regulations, we find the reasoning in that case instructive."). In *Harris*, FedEx hired a "power-only" contractor (i.e., a company that provided "a driver with a tractor") to haul FedEx trailers to a service center. *Harris*, 860 F. Supp. 2d at 973–74. After the driver caused an accident that injured his passenger and killed a driver of an oncoming vehicle, the passenger and the deceased driver's family sued FedEx, arguing that the driver's negligence was imputed to FedEx under Federal Motor Carrier Safety Regulations based on its status as a registered motor carrier. *Id.* at 975, 977. FedEx moved for summary judgment on the ground that there were "no facts supporting imputation of [the driver's] alleged negligence to FedEx."

*Id*. at 976. The district court agreed. The court explained that a defendant's authority to operate as a motor carrier is irrelevant for purposes of determining whether it bears ultimate financial responsibility in a particular case. *Id.* at 979. What is relevant is whether the defendant was *acting as a motor carrier* in the transaction at issue. *Id.* And in that case, FedEx was acting as a *shipper*, not a motor carrier. *Id.*

In *Gonzalez*, the supreme court stated that the plaintiff in the *Harris* case was attempting to "'bootstrap' FedEx into 'motor carrier' status by stretching the regulatory language," when it was the "power-only" contractor that assumed the role of motor carrier under those facts. 463 S.W.3d at 505 (quoting *Harris*, 860 F. Supp. 2d at 980). The supreme court concluded that Gonzalez's role with respect to the transaction at issue there was analogous to FedEx's role in the transaction at issue in *Harris*—"Gonzalez was acting as a shipper, not a motor carrier" because there was "no evidence that Gonzalez exercised any control over the trucks or the drivers as they transported the silage to the feed yard." *Id.* at 505.

Ten Hagen argues that, like the defendants in *Harris* and *Gonzalez*, there is no evidence that Ten Hagen exercised control over the 18-wheeler at the time of the accident. We disagree. As we describe in greater detail below, Ross testified that Ten Hagen was directing the operation of the 18-wheeler at the time of the accident. The night before the accident, Ten Hagen directed Ross to pick up some trees and haul them to a recycling center. Ross picked up the trees, kept the trees on the trailer, parked the 18-wheeler on Ten Hagen's lot overnight, and delivered the trees to the recycling center the next day. After Ross dropped off the trees, Ten Hagen directed him to pick up a load of fill dirt in Arlington and haul it to Plano. After Ross did that, a Ten Hagen superintendent directed Ross to go to Burleson to pick up more trees and haul them to the recycling center. On his way to get the trees, Ross caused the accident at issue in this case. And

–13–

Ten Hagen's name and motor carrier number—and no one else's—were on the tractor at the time of the accident:



Based on all of the evidence presented in this case, we conclude that Ten Hagen met the applicable definition of a motor carrier because it was controlling or directing the operation of the 18-wheeler at the time of the accident. As a result, the trial court properly granted the Castros' motion and instructed the jury that Ten Hagen was Ross's statutory employer. We resolve this issue against Ten Hagen.

### LEGAL SUFFICIENCY OF THE EVIDENCE

Next, Ten Hagen argues that the evidence is legally insufficient to support four of the jury's findings. More specifically, Ten Hagen challenges the evidence supporting the findings that (1) Ross was acting in the scope of employment at the time of the accident, (2) Ross's negligence caused the accident and Martinez's negligence did not cause the accident, (3) $150,000 would fairly and reasonably compensate Lorena for her past physical pain and mental anguish, and (4) $10,911.13 would fairly and reasonably compensate Lorena for her past medical care expenses.

**Standard of Review**

When a party challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *See City of Keller*, 168 S.W.3d at 822. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. To determine whether the evidence meets this test, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. Anything more than a "scintilla of evidence" is legally sufficient to support the jury's finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). To be more than a scintilla, the evidence must rise "to a level that would enable reasonable and fair-minded people to differ in their conclusions." *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994).

When a party challenges the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the party must demonstrate on appeal that there is no legally cognizable evidence to support the adverse finding. *See, e.g.*, *City of Keller*, 168 S.W.3d at 813 (explaining "evidence that might be 'some evidence' when considered in isolation is nevertheless 'no evidence' when contrary evidence shows it to be incompetent"). Evidence is legally insufficient to support a finding if the record shows (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).

**First Finding: Scope of Employment**

Ten Hagen argues that it did not owe a legal duty to the Castros, regardless of whether "Ross were Ten Hagen's employee," because the evidence conclusively demonstrates that Ross was not acting in the scope of his employment at the time of the accident. *See generally Guerra*, 348 S.W.3d at 228 (evidence is legally insufficient to support a finding if record shows evidence conclusively establishes the opposite of a vital fact).

<u>Applicable Law</u>

Under common law, an employer is generally liable for the tort of its employee "only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (internal quotation omitted). The specific elements require that an employee's act must be (1) committed within the scope of the general authority of the employee, (2) in furtherance of the employer's business, and (3) for the accomplishment of the object or purpose for which the employee was hired. *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 715 (Tex. App.—Fort Worth 2006, no pet.) (citing *Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972); *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971)). Applying these elements in a case involving a car accident, for example, employers generally are not liable for accidents involving their employees while the employees are traveling to and from work. *See Tex. Gen. Indem. Co. v. Bottom*, 365 S.W.2d 350, 354 (Tex. 1963). Even when utilizing an employer-owned vehicle, an employee is not always acting in the scope of employment. *See, e.g.*, *Goodyear Tire & Rubber Co.*, 236 S.W.3d at 757.

<u>Analysis</u>

To determine whether the evidence is legally sufficient to support the jury's finding, we begin by summarizing Ross's testimony. Ross testified that he was working for Ten Hagen on the day of the accident hauling trees and dirt to and from suburbs near Dallas. He was paid by the hour, not by the load, and he "believe[s]" the exact amount was $50 per hour. Ross started the day by delivering a load of trees that were left in the trailer from the previous day. Next he drove to Arlington, picked up a load of dirt, and delivered that load to Plano. After Ross dropped off the dirt in Plano, a superintendent for Ten Hagen told Ross to drive to Burleson (which he later indicated may have been Joshua rather than Burleson) to pick up another load of trees. The accident occurred while Ross was on his way to pick up the second load of trees:

Q. Okay. So at the time of this accident, you were on your way to a job that Ten Hagen had directed you to go to; is that correct?

A. Yes.

Q. You were going to go to Burleson, you were going to pick up some—what did you say trees?

A. Trees.

Q. And what were you going to do with the trees?

A. Haul them to recycling.

Q. All of that was done on behalf of Ten Hagen and at Ten Hagen's direction; is that correct?

A. Schedule, yes.

Q. And how was it that you were told or how did you learn that you were to go out to Burleson and pick these trees up? Did they tell you after you do the drop-off in Plano, go here?

A. The superintendent did.

Q. People from Ten Hagen told you that?

A. Right.

> Q.  Okay. So in terms of the directions that you received to go out to Burleson, pick up this load, the superintendent for Ten Hagen told you to go do that; is that correct?
>
> A.  After I got done with Plano, to go haul trees.

Ross explained that he chose a route that included Interstate 30 because the job site in Plano may have needed another load of dirt, and if so he could "pick it up on 30."

Despite Ross's testimony, Ten Hagen argues that the evidence conclusively established that Ross was not acting in the scope of his employment at the time of the accident for two reasons. First, Ten Hagen argues that Ross was not "on the clock" at the time of the accident:

- Ross had delivered his load for Ten Hagen in Collin County before the crash;

- the crash occurred later in Dallas County;

- Ross was not hauling anything for Ten Hagen at the time of the crash—his truck was empty;

- while Ross testified he was driving toward another job for Ten Hagen, Ross was paid hourly *only* during the time he spent for loading and hauling of materials for Ten Hagen—he was not on the clock when driving between hauling jobs.

Second, Ten Hagen argues that it was "not controlling Ross or his actions at the time of the crash."

To support its argument that Ross was "on the clock" only when he was loading or hauling materials, Ten Hagen cites two pages from the testimony of Ten Hagen's president, Scott Ten Hagen. On the first page (read in context with the related questions and answers on the prior page), Scott testified that Ten Hagen generally preferred to pay bigger hauling companies (not Ross) a "flat fee" or "set price per load" because it was harder to monitor the bigger companies' drivers. Next Scott was asked if Ross "[had] a load" at the time of the accident, and he answered, "No." These statements, however, do not conclusively demonstrate that Ross was paid or "on the clock" only when he was loading or hauling materials. *See generally City of*

–18–

*Keller*, 168 S.W.3d at 816 (noting "[u]ndisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive"). Moreover, Ross testified that he was paid $50 per hour and not by the load.

On the second page, Scott testified that Ross's timesheet on the date of the accident stated that he stopped work at noon, which was before the accident. To the extent that Ten Hagen argues that Scott's testimony and Ross's timesheet are conclusive evidence that Ross was not "on the clock" at the time of the accident, we disagree. In addition to listing one start time and one stop time, Ross's timesheet on the day of the accident also stated a total work time of "4" hours. It is undisputed that during this unbroken 4-hour work period the trailer he was hauling was empty at least once—when he was driving from the recycling plant to Arlington. No time was subtracted, however, for the time that the trailer was empty. Added together, Ross's timesheets indicated that he worked a total of 27 hours during the week of the accident—9 hours on Monday (8 a.m. to 5 p.m.), 4 hours on Tuesday (with no start or stop time listed), 10 hours on Wednesday (8 a.m. to 6 p.m.), and 4 hours on Thursday (the date of the accident). Ross's timesheet for Wednesday indicated that he hauled at least 3 loads that day, but no "off the clock" time is listed. Ross's time records also showed that he was paid a total of $1620 for 27 hours of work that week. In short, based on Ross's timesheets for the week of the accident, Ross was paid $60 for every hour that he was hauling Ten Hagen's trailer, including when it was empty. We conclude that the evidence does not conclusively demonstrate that Ross was not "on the clock" at the time of the accident.

Finally, Ten Hagen argues that the evidence conclusively demonstrated that Ten Hagen was "not controlling Ross or his actions at the time of the crash." To support this argument, Ten Hagen cites generally to two pages of Ross's testimony. In those pages Ross testified that when the accident occurred he was on his way to pick up trees for Ten Hagen in Burlington or Joshua,

–19–

and that he was on Interstate 30 because the job site in Plano may have needed another load of dirt and Interstate 30 "was the same highway that [he] got the previous load from." This testimony, however, does not conclusively demonstrate that Ten Hagen was not controlling Ross or his actions at the time of the accident. To the contrary, Ross's testimony that he was working for Ten Hagen at the time of the accident and traveling to pick up a load of trees at Ten Hagen's direction is more than a scintilla of evidence that Ten Hagen was controlling Ross's actions at the time of the crash.

We conclude that the evidence at trial would enable reasonable and fair-minded jurors to find that Ross was acting in the scope of his employment at the time of the accident. *See, e.g.*, *Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717, 721 (Tex. App.—Austin 2004, no pet.) (employee in scope of employment when collision occurred while he was making "breakfast run" for shop employees at manager's affirmative request); *see also Gebert v. Clifton*, 553 S.W.2d 230, 232 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ dism'd) (employee in scope of employment when collision occurred while returning from location where he had been at employer's direction, in furtherance of employer's business). We resolve this issue against Ten Hagen.

### Second Finding: Ross's Negligence Caused the Accident

Next Ten Hagen argues that the evidence is legally insufficient to support the jury's finding that Ross's negligence alone caused the accident. More specifically, Ten Hagen argues that eyewitness testimony supporting the finding was "rendered incompetent" or "condemned" by the "objective physical evidence." *See generally Guerra*, 348 S.W.3d at 228 (evidence is legally insufficient to support a finding if record shows evidence conclusively establishes the opposite of a vital fact).

–20–

<u>Summary of the Evidence</u>

Nine people testified about the accident: the three plaintiffs, four other eyewitnesses, one investigator, and one accident-reconstruction expert. The eyewitness testimony was somewhat conflicting. The conflicts centered on the initial collision in the westbound lanes, and the speed of the eastbound traffic at the time.

The first witness was George Cantu, the passenger in the cement truck. Cantu testified that there were a total of four westbound lanes and that the cement truck was hit twice from behind while traveling in the left center lane (i.e., the lane just to the right of the inside lane). He described traffic conditions at the time as "a normal day."

The second witness was Timothy Allman, the Dallas County Deputy Sheriff who investigated the accident. He testified that he has received training in traffic accident investigations and has six or six-and-a-half years of experience investigating accidents. He has investigated approximately 200 accidents, including at least 60 or 70 "serious wrecks" like this one. During this investigation, he reviewed physical evidence including skid marks and property damage. He and other deputies spoke to three eyewitnesses at the scene—Ross, Martinez, and a man named Jose Leija who was traveling in one of the eastbound vehicles. As summarized in his accident report diagram, Allman concluded that the cement truck was traveling in the inside westbound lane and the 18-wheeler was traveling in the center westbound lane at the time of the initial impact, and that the impact occurred when the 18-wheeler entered the left lane from the center lane (the 18-wheeler is identified as units 1 and 2; the cement truck is identified as unit 3):



The third witness (appearing by deposition) was Elsa Castillo, the front-seat passenger in the vehicle identified as unit 7 on the accident diagram. Castillo testified that she was traveling eastbound in the center lane at approximately 55 miles per hour in light traffic when she looked over at the westbound traffic and saw the 18-wheeler change lanes from the center lane to the left lane and hit the cement truck. She described the initial impact as follows:

Q   What part of the 18-wheeler made contact with what part of the cement truck or vice versa?

A   The front part. It was like the cement truck—it hit like the side of the cement truck.

Q   Now, tell me. I'm not sure what that means to you. Can you tell me?

A   Like the very end of the cement truck.

–22–

Q       When you say very end, do you mean the back?

A       Yes.

Q       What—okay.  What part of the 18-wheeler collided with the back of the cement truck?

A       It was like the front part of the 18-wheeler?

Q       The cab where the driver sits?

A       I believe so.

The fourth witness (also appearing by deposition) was Jose Leija, the driver of the vehicle identified as unit 4 on the accident diagram.  Leija testified that he was traveling eastbound in the inside lane (i.e., the lane closest to the center guard rail).  According to Leija, eastbound traffic was "very slow as usual" and westbound traffic was moving at a normal speed. Leija testified that he was "able to witness the accident" because traffic was "pretty much at a stop."  As the westbound vehicles were approaching Leija, the cement truck was in the inside lane and the 18-wheeler was in the center lane.  The cement truck was driving faster than the 18-wheeler and was passing the 18-wheeler when the 18-wheeler moved into the left lane and hit the cement truck.  Leija described the initial impact as follows:

The cement truck was coming kind of close too on this side, and then it passed it, passed the 18-wheeler. Once it passed the 18-wheeler, the point of contact was in between the cargo and the cab of the cement truck.

Because of his vantage point, Leija was able to see the surprised look on the faces of the men in the cement truck.

The fifth witness was Martinez.  He testified that he was driving the cement truck westbound in the center lane at the time of the accident.  He was on his way back to his company's cement plant and was about 3/4 mile away from the exit he needed to take to get to the plant.  According to Martinez, westbound traffic was "almost desolate" and eastbound traffic was "stopped."  As he prepared to move over into the right lane, he looked in both of his

rearview mirrors and did not see any vehicles behind him. Before he could move over, he was hit twice from behind. After the second impact, he was unable to control the cement truck.

The sixth witness (appearing by deposition) was Ross. Ross testified that he was driving the 18-wheeler westbound in the center lane and the cement truck was in the right lane. According to Ross, the cement truck moved into the center lane and hit the right side of Ross's tractor. Ross generally described the traffic at the time as "the same as it normally is that time of day"—traffic was not stopped, but "[e]veryone's not hauling ass to get somewhere."

The Castros, who were in the vehicle identified as unit 6 on the accident diagram, testified that they were traveling home in the eastbound lanes and did not see the initial collision in the westbound lanes. They both testified that eastbound traffic was very slow at the time of the accident.

The ninth and final witness was Hal Watson Jr., Ph.D., Ten Hagen's accident-reconstruction expert. Watson is a former university professor who taught mechanical engineering courses for 35 years. Watson specializes in forensic engineering or accident reconstruction, including traffic accidents, industrial accidents, and construction accidents. He has given deposition testimony in hundreds of cases and testified in state and federal court around 75 or 80 times.

The defendants hired Watson five days after the accident. He "drove the scene" but was unable to "walk the scene" because the accident occurred on a busy freeway with "very narrow shoulders [and] almost no median." In addition, he also went to the "state compound" to see and photograph the cement truck and the 18-wheeler. He also met with Allman and reviewed the accident report, read the deposition testimony of eyewitnesses, and reviewed all of the videos and pictures that were taken at the scene by news agencies and others.

Based on his investigation, Watson concluded that Martinez caused the accident by moving into Ross's lane of traffic:

> It is my opinion that this incident was caused by the driver of the cement mixer in either attempting to change lanes when unsafe or failing to drive his vehicle in a single travel lane and to impact the side of Ross'[s] truck, which started a chain of events in which the cement truck veered left into the inside travel lane and into the guard fence and took Ross'[s] truck and trailer with him.

According to Watson, the damage to the 18-wheeler shows that the accident could not have occurred the way it was described in the accident report:

> The Buddy Ross tractor was damaged all the way across the front of the vehicle. The major damage done to his tractor was on the right front. The right front bumper was bent all the way in, the fender was crumpled, and the wheel was deflated. It takes a great deal of force to deflate a large truck tire. It rarely happens in a collision.
>
> If the—on the other hand, on the left side of the vehicle, which is where the police officer said the initial contact was made, there is slight damage, but the steering would not have been affected on that wheel. The wheel was not affected. The tire was not affected. The bumper wasn't bent. If there had been a collision like he described, there would be major damage to the front of the Buddy Ross tractor on the left side. That was not there.

In Watson's opinion, the physical evidence supports Ross's testimony. For example, Watson testified that the damage to Ross's tractor on the passenger side and the right front side is consistent with a "sideswipe-type collision" and with Ross's statement that the cement truck hit the passenger side of his tractor:





In addition, according to Watson, skid marks leading from the center lane to the median show that "heavy braking and steering forces began in the center lane, not in the inside lane."

On cross-examination Watson acknowledged that he wanted to do a full inspection of the cement truck but was able to do only a "cursory inspection" because of how and where it was parked at the compound. Watson was also asked about certain pictures (not identified by exhibit number) that apparently showed damage to the guard rail and the 18-wheeler's final position on the guard rail. Watson appeared to deny that the guard rail could have caused the damage he says could be attributed only to the impact from the cement truck.

Analysis

Ten Hagen argues that the testimony of Castillo and Leija cannot support the jury's finding for two reasons. First, Ten Hagen argues that their testimony was incompetent because their view was obscured—i.e. they were "traveling on the highway in the opposite direction" and "would have been on the other side of a concrete barrier." As the supreme court has explained, there may be certain cases in which an eyewitness's testimony is no evidence of what occurred, such as when "an eyewitness's location renders a clear view of an accident 'physically impossible.'" *City of Keller*, 168 S.W.3d at 812. But this is not one of those cases. Although there was a divider between the eastbound and westbound lanes, the evidence does not show that it was a "concrete barrier" or that it was high enough to render the view of the westbound lanes from the eastbound lanes physically impossible. Instead, images introduced into evidence during trial by Ten Hagen show that the lanes were divided by a short metal guard rail:



In addition, Leija specifically testified that he was able to see the initial impact "because it was up high."

Ten Hagen also argues that the testimony of Castillo and Leija is incompetent because their testimony was irreconcilably conflicting as to how the initial impact in the westbound lanes occurred and the speed of eastbound traffic at the time. With respect to the initial impact, Ten Hagen argues that Castillo's testimony that the 18-wheeler hit the cement truck "from behind" cannot be reconciled with Leija's testimony that the 18-wheeler hit the left side of the cement truck. And with respect to the speed of eastbound traffic at the time, Ten Hagen argues that Castillo's testimony that she was traveling 55 miles per hour cannot be reconciled with Leija's testimony that he was stopped in standstill traffic. We do not agree. Castillo and Leija had different vantage points because they were not in the same vehicle or in the same lane when the initial impact occurred. But they both said the cement truck was in the inside lane and the 18-

wheeler was in the center lane. In addition, they both testified that the 18-wheeler hit the cement truck. And with respect to the discrepancy in their descriptions of the speed of eastbound traffic at the time, it may be explained in part by the fact that they were in different lanes. Nevertheless, even if their testimony was irreconcilably conflicting, that would not render it legally insufficient to support a jury's verdict. It is the jury's prerogative to resolve conflicts in testimony. *See City of Keller*, 168 S.W.3d at 819 (noting jurors "may choose to believe one witness and disbelieve another"); *see also Sw. Energy Prod. Co. v. Berry-Hefland*, No. 13-0986, 2016 WL 3212999, at *11 (Tex. June 10, 2016) ("If the evidence conflicts, it is the province of the jury to determine which evidence to credit.").

With respect to all of the testimony from witnesses who attributed fault to Ross—including Leija, Castillo, and Martinez—Ten Hagen argues that their testimony cannot support the jury's finding because it is "condemned by the physical evidence." To support this argument, Ten Hagen cites repeatedly to Watson's expert testimony concerning the "objective physical evidence."

To the extent that Ten Hagen argues that the jury could not disregard Watson's conclusion that Martinez caused the accident, we disagree. Expert testimony is not required to establish negligence in a traffic-accident case if the question is not complex and not beyond the competence of an average juror. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 892 (Tex. App.—Texarkana 2004, pet. denied). In other words, "not every motor vehicle accident requires expert testimony to understand how it took place and who is at fault." *Id.* This is particularly true when several fact witnesses testify about the cause of the accident and the physical evidence is not outside a layperson's common sense or understanding. *See id.* In short, Watson's testimony may have been admissible as probative evidence, but it was the province of

–29–

the jury to decide how much weight, if any, to give to his testimony. *See City of Keller*, 168 S.W.3d at 819; *see also Sw. Energy Prod. Co.*, 2016 WL 3212999, at \*11.

And to the extent that Ten Hagen contends that the physical evidence in this case is conclusive and allows for only one logical inference on the issue of whose negligence caused the accident, we disagree. As the supreme court has explained, "there are few instances in which disputed evidence is conclusive." *City of Keller*, 168 S.W.3d at 816.

In this case, the two pictures that were specifically identified during Watson's testimony (as shown above) show damage to the front and sides of Ross's vehicle—not just the passenger side. We also note that in at least one of Ten Hagen's pictures of the accident scene, the right front wheel of the 18-wheeler appears to be resting on the guard rail:



It appears that the metal steps below the passenger door are bent forward in one of the pictures Watson relied upon—but these pictures were taken after the vehicle was removed from its final position on the center guard rail, and Ten Hagen does not cite evidence showing how the

steps looked before the accident or how they looked before authorities removed the 18-wheeler from the center guard rail. In short, we cannot say that there is any objective physical evidence in this case that conclusively demonstrates that Ross's negligence was not the sole cause of the accident. *See, e.g.*, *Cty. of Dallas v. Poston*, 104 S.W.3d 719, 724 (Tex. App.—Dallas 2003, no pet.) (rejecting defendant's argument that objective physical evidence rendered plaintiff's testimony legally insufficient to support finding of negligence).

We conclude that the evidence at trial would enable reasonable and fair-minded jurors to find that Ross's negligence alone caused the accident. We resolve this issue against Ten Hagen.

**Third Finding: $150,000 for Lorena's Past Physical Pain and Mental Anguish**

Next Ten Hagen argues that the evidence is legally insufficient to support the jury's finding that $150,000 would fairly and reasonably compensate Lorena for her past physical pain and mental anguish. More specifically, Ten Hagen argues that there was less than a scintilla of evidence to support each element of the award. *See generally Guerra*, 348 S.W.3d at 228 (evidence is legally insufficient to support a finding if record shows evidence offered to prove a vital fact is no more than a scintilla).

Applicable Law

As we recently explained in another truck-accident case, the process of awarding damages for discretionary, amorphous injuries such as pain and suffering or mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Swearinger v. Guajardo*, No. 05-15-00202-CV, 2016 WL 4162785, at *2 (Tex. App.—Dallas Aug. 5, 2016, no. pet. h.) (mem. op.) (citing *Dawson v. Briggs*, 107 S.W.3d 739, 750 (Tex. App.—Fort Worth 2003, no pet.)). "A great deal of discretion is given to the jury in awarding an amount of damages it deems appropriate for pain and suffering." *Christian Care Ctrs., Inc. v. O'Banion*, No. 05-12-01407-CV, 2015 WL 5013615, at *4 (Tex. App.—Dallas Aug. 25, 2015,

no pet.) (mem. op.). Evidence of past pain and mental anguish may be proven through a plaintiff's testimony or other evidence, including circumstantial evidence. *Id.* If there is no direct evidence of pain, the jury is permitted to infer the occurrence of pain from the nature of the injury. *Id.*

Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress. *See Swearinger*, 2016 WL 4162785, at *2. Evidence of a high degree of mental pain and distress must be more than mere worry, anxiety, vexation, embarrassment, or anger. *Id.*

<u>Evidence at Trial</u>

Lorena testified that she was 18 years old at the time of the accident. On that day she had been attending Remington College in Fort Worth studying to be a medical x-ray assistant. Her father picked her up in the family's only vehicle. They were driving eastbound on Interstate 30 toward their home and planned to stop at the store first. Their car was stopped in heavy traffic when a westbound cement truck crossed over the guard rail and hit them. When Lorena was asked if the impact was scary, she said, "Yeah, it really was." Photographs of the accident show that the Castros' car was smashed and its top was torn off:



After seeing pictures of the Castros' vehicle taken at the accident scene, the defendants' rebuttal medical expert agreed that if Lorena was in the vehicle at the time of the accident, she was "fortunate" not to have been "hurt very bad."

Lorena got out of the car by climbing out of the top, but her father was trapped inside. After she got out, she wanted to help her father, but others at the scene would not allow her because "they didn't know if anything was going to either blow up or anything was going to catch on fire." When she was shown a picture of their car at the accident scene Lorena cried, then apologized, as she tried to explain how she felt watching her dad trapped inside the car:

> Q.  . . . [W]hat was scaring you? Was it the possibility that something was going to catch on fire, or was it something different?
>
> A.  It was different.
>
> Q.  What was it?
>
> A.  I mean, my dad was trapped. I couldn't do anything to help. (Witness is crying). Sorry.

The record does not indicate how long she cried on the stand, but when she was able, she continued to testify and began to list her injuries caused by the accident, including neck pain from whiplash and back pain. When asked if she felt like she had "healed 100 percent emotionally from the trauma," Lorena answered, "No."

After her father was pulled from the vehicle, she rode with him in the ambulance to the hospital and stayed with him as long as she could. A notation in Lorena's medical records indicates that she was covered in glass when she arrived at the hospital, and that she was admitted to the hospital complaining that she felt glass in her eye:

> Patient began complaining of glass in her eye, shoes, and clothing. Patient was admitted by 7:26 to Methodist Hospital.

When she was examined, hospital personnel could not see any object in her eye. But after she left the hospital Lorena began to feel pain in her neck, arm, and lower back. The pain did not go away, and a month after the accident, she sought treatment from a chiropractor. According to the chiropractor's medical records, Lorena described her symptoms to the chiropractor as neck pain, mid-back pain, headaches, left shoulder pain, left leg pain, and chest pain. Lorena responded favorably to the treatment, which she received for four months after the accident. At the time of trial she said her pain was better and that "it comes and goes" maybe once or twice a month.

Analysis

With respect to Lorena's past mental anguish, Ten Hagen argues that Lorena offered less than a scintilla of evidence to support her claim because her evidence did not show a high degree of mental pain and distress and instead her "only testimony was that the crash scared her." We disagree. Lorena cried on the witness stand almost four years later when she saw a picture from the accident scene and recounted the trauma of seeing her father trapped in the car as people on the scene warned her it might explode. In addition, the evidence in this case included numerous disturbing pictures of the damage to the Castros' car. Considering the evidence in the light most

favorable to the finding, we conclude that there is more than a scintilla of evidence concerning Lorena's high degree of mental pain and distress.

With respect to Lorena's past physical pain, Ten Hagen argues that Lorena offered only "scant evidence" of "minor pain." We disagree. According to her chiropractor's medical records, when Lorena visited the chiropractor one month after the accident, she reported "that her vehicle was thrown sideways," "[h]er body was thrown forward," "[s]ince the accident she has experienced progressively severe headaches [and that] [h]er pain began later the same day." It took her four months to recover from most of the pain of her injuries, and she was still experiencing some pain at the time of trial (almost four years later).

Additionally, the jury was asked a broad-form question, and asked for a lump-sum answer, concerning two amorphous injuries—Lorena's past physical pain and mental anguish. Under these circumstances, and in light of the evidence in this case, Lorena's past mental anguish or past physical pain alone could support the jury's entire lump-sum award. *See, e.g.*, *Figueroa v. Davis*, 318 S.W.3d 53, 63 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Sufficient evidence of either past physical pain or past mental anguish could support the award because the charge did not ask for separate damages figures for each type of injury.").

We conclude that the evidence at trial would enable reasonable and fair-minded jurors to find that $150,000 would fairly and reasonably compensate Lorena for her past physical pain and mental anguish. We resolve this issue against Ten Hagen.

**Fourth Finding: $10,911.13 for Lorena's Past Medical Care Expenses**

Finally, Ten Hagen argues that the evidence is legally insufficient to support the jury's finding that $10,911.13 would fairly and reasonably compensate Lorena for her past medical care expenses. More specifically, Ten Hagen argues that Lorena did not present any evidence that her medical expenses were causally related to the accident. *See generally Guerra*, 348

S.W.3d at 228 (evidence is legally insufficient to support a finding if record shows a complete absence of evidence of a vital fact).

Applicable law

A plaintiff must establish through competent evidence that her injuries were causally related to the event sued upon. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984). Expert testimony regarding this causal nexus is not always required. *See id*. at 733. In the context of an automobile accident, lay testimony "establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition" can support a finding of causation if the conditions

> (1) are within the common knowledge and experience of laypersons, (2) did not exist before the accident, (3) appeared after and close in time to the accident, and (4) are within the common knowledge and experience of laypersons, caused by automobile accidents.

*Guevara v. Ferrer*, 247 S.W.3d 662, 667 (Tex. 2007).

Analysis

First, Ten Hagen argues that there is no evidence that Lorena's chiropractic expenses were causally related to the accident. But Ten Hagen refers to chiropractic expenses "beginning January 12, 2011 (two months after the accident)," while Lorena's chiropractic records showed that she began seeing the chiropractor on December 10—less than one month after the November 11 accident. The records stated that she was seen "for treatment of injuries that she sustained as the result of a motor vehicle accident." During her examination Lorena told the chiropractor "that her vehicle was thrown sideways," "[h]er body was thrown forward," "[s]ince the accident she has experienced progressively severe headaches [and that] [h]er pain began later the same day." Lorena also told the chiropractor that her injuries from the car accident caused neck pain, mid-back pain, headaches, left shoulder pain, left leg pain, and chest pain. The chiropractor's records also indicated that prior to the accident, Lorena reported no history of surgery, accident,

–36–

injury, broken bones or any other condition or injury that may have caused the symptoms. Viewed together, Lorena's testimony and chiropractic records generally meet the requirements set forth in *Guevara* and connect her injuries to the accident. *See Guevara*, 247 S.W.3d at 667.

Ten Hagen argues that the "uncontroverted testimony" from its rebuttal medical expert established that Lorena's injuries "would not be expected to cause ongoing complaints more than a couple of months after the accident." To the extent Ten Hagen argues that this testimony conclusively established the opposite of a vital fact (i.e., that Lorena's injuries were *not* caused by the accident), we disagree. Although he may have disputed how long the pain would last, he did not testify that Lorena's injuries were not caused by the accident.

Although Ten Hagen also argues that there is no causal connection between Lorena's "2013 medical care expenses" and the 2010 accident, it does not cite to the record or otherwise identify or describe the 2013 medical care expenses. Consequently, we do not address it. *See Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 817 (Tex. App.—Dallas 2003, pet. denied).

We conclude that the evidence at trial would enable reasonable and fair-minded jurors to find that $10,911.13 would fairly and reasonably compensate Lorena for her past medical care expenses. We resolve this issue against Ten Hagen.

### EXCLUSION OF REBUTTAL EXPERT TESTIMONY

Ten Hagen argues that the trial court abused its discretion when it excluded part of the trial testimony of Ten Hagen's medical expert, John Sklar, M.D.—which Ten Hagen intended to introduce to rebut the Castros' evidence that their past medical expenses were reasonable and necessary (i.e. to rebut the affidavits of the Castros' medical providers made pursuant to section 18.001 of the Texas Civil Practice and Remedies Code). Ten Hagen argues that the trial court abused its discretion twice—first, when it granted the Castros' pretrial motion to strike Sklar's

counteraffidavits for failure to comply with section 18.001; and second, when it excluded Sklar's trial testimony because it had previously struck Sklar's counteraffidavits. Alternatively, Ten Hagen argues that even without a proper counteraffidavit, section 18.001 did not preclude Ten Hagen from introducing Sklar's testimony at trial to rebut the Castros' evidence that their past medical expenses were reasonable and necessary. Ten Hagen argues that the exclusion of this evidence probably caused the rendition of an improper judgment and warrants a remand for new trial.

**Standard of Review**

We review a trial court's rulings admitting or excluding evidence under an abuse of discretion standard. *Hong v. Bennett*, 209 S.W.3d 795, 799 (Tex. App.—Fort Worth 2006, no pet.). We will uphold the ruling if there is any legitimate basis in the record to support it. *See id.* A trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion. *See id.*

**Section 18.001 Affidavits Concerning Past Medical Expenses**

Because Ten Hagen's arguments center on civil practice and remedies code section 18.001, and because it argues that the trial court misapplied the law relating to section 18.001 counteraffidavits, we set forth in detail the purpose, requirements, and effect of affidavits and counteraffidavits made pursuant to section 18.001 of the civil practice and remedies code.

In a personal injury case, a claim for past medical expenses must be supported by evidence that (1) the plaintiff's injuries were caused by the defendant's negligence, and (2) the medical treatment was necessary and the charges for that treatment were reasonable. *See generally Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex. 1997) ("We [ ] hold that a plaintiff should recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant[.]"); *Whitaker v.*

–38–

*Rose*, 218 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting even default judgment does not relieve plaintiff of burden to show past medical expenses were reasonable and necessary). A plaintiff can present evidence concerning the reasonableness and necessity of past medical expenses through (1) expert testimony, or (2) an affidavit from the plaintiff's medical provider made pursuant to section 18.001. *See Whitaker*, 218 S.W.3d at 223; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001 (West 2013). In other words, a medical provider's section 18.001 affidavit can save the plaintiffs the expense of having to hire an expert to testify that their medical expenses were reasonable and necessary.[12]  *See Turner v. Peril*, 50 S.W.3d 742, 747 (Tex. App.—Dallas 2001, pet. denied) ("Section 18.001 provides a significant savings of time and cost to litigants, particularly in personal injury cases, by providing a means to prove up the reasonableness and necessity of medical expenses.").

As our sister court explained, section 18.001 is, in essence, an exception to the hearsay rule:

> Section 18.001 is an evidentiary statute which accomplishes three things: (1) it allows for the admissibility, by affidavit, of evidence of the reasonableness and necessity of charges which would otherwise be inadmissible hearsay; (2) it permits the use of otherwise inadmissible hearsay to support findings of fact by the trier of fact; and (3) it provides for exclusion of evidence to the contrary, upon proper objection, in the absence of a properly-filed counteraffidavit.

*Beauchamp v. Hambrick*, 901 S.W.2d 747, 749 (Tex. App.—Eastland 1995, no writ). But the exception to the hearsay rule applies only when no controverting affidavit is served:

> Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

---

[12] Section 18.001 generally applies in "all civil actions" in which a plaintiff seeks to recover damages for amounts that have already been paid to a service provider. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(a)–(b). Section 18.001 addresses only the issue of the reasonableness and necessity of past expenses—it does not establish "the requisite causal link" between the occurrence and the plaintiff's damages. *See Gunn v. McCoy*, 489 S.W.3d 75, 101 (Tex. App.—Houston [14th Dist.] 2016, pet. filed).

TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(b).[13] And even when the exception applies and the uncontroverted affidavit is admissible, it is not conclusive evidence as to the amount of recoverable damages for past medical expenses. *See Gunn v. McCoy*, 489 S.W.3d 75, 101 (Tex. App.—Houston [14th Dist.] 2016, pet. filed). The jury is not required to award a plaintiff the amount of damages established in the affidavit, but if it chooses to do so, the affidavit is sufficient evidence to support the finding that the past medical expenses were reasonable and necessary. *See Gutierrez v. Martinez*, No. 01-07-00363-CV, 2008 WL 5392023, at *9 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, no pet.) (mem. op.).

If an opposing party intends to controvert a claim reflected by an initial affidavit, the opposing party must serve a counteraffidavit. There are two main requirements for a counteraffidavit: (1) it must give reasonable notice of which claims the opponent intends to controvert and why, and (2) it must be made by a person who is qualified to testify about the matters in dispute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(f).[14]

**Procedural Background**

In this case, in support of their claims for past medical expenses, the Castros served several provider affidavits pursuant to section 18.001 attesting to the reasonableness and necessity of the services they provided. The medical providers included a hospital, medical doctors, ambulance service, chiropractors, pharmacy, anesthesia consultants, a surgical acute care provider, radiological consultants, laboratory consultants, and other medical providers. In

---

[13] The general requirements for a provider's affidavit concerning the reasonableness and necessity of past medical expenses are set forth in section 18.001(c). *See* TEX. CIV. PRAC. & REM. CODE § 18.001(c). In addition, section 18.002 sets forth detailed templates that providers and records custodians can use to ensure compliance with section 18.001. *See id.* § 18.002. Under section 18.001(d), a party who intends to present the affidavit as evidence at trial must serve a copy of the affidavit on all other parties at least 30 days before the start of the plaintiff's case at trial. *Id.* § 18.001(d).

[14] Under section 18.001(e), a party who intends to controvert an affidavit must serve a copy of the counteraffidavit on each party (1) within 30 days of receiving the affidavit and at least 14 days before the start of the plaintiff's case at trial, or (2) with leave of court, before the start of the plaintiff's case at trial. *Id.* § 18.001(c).

response, Ten Hagen served counteraffidavits prepared by Sklar essentially controverting many of the claims stated in the Castros' section 18.001 affidavits.

Before trial, the Castros moved to strike Sklar's counteraffidavits on the grounds that (1) he was not qualified to controvert the affidavits of the Castros' medical providers, and (2) his counteraffidavits failed to give the Castros reasonable notice of the bases on which he intended to controvert the claims reflected in the affidavits of the Castros' medical providers. In addition, the Castros moved to strike Sklar's counteraffidavits because they largely focused on his opinion that the Castros' injuries were not caused by the accident, which is outside the scope of section 18.001. The trial court granted the motion and struck Sklar's counteraffidavits without stating the basis for its ruling.

As part of the evidence it intended to offer at trial, Ten Hagen designated portions of Sklar's deposition testimony that it intended to play for the jury, and the Castros apparently filed a motion to strike this testimony before it was offered. Although the motion itself is not in the appellate record, it appears from the hearing on it that the Castros made two main arguments in their motion: (1) the trial court should strike Sklar's testimony regarding his opinion that the accident was not the proximate cause of the Castros' injuries because Ten Hagen's pretrial disclosure concerning Sklar's causation opinions was inadequate, and (2) the trial court should strike Sklar's testimony about the reasonableness and necessity of the Castros' past medical expenses because it previously struck his section 18.001 counteraffidavits on the same subject. The trial court denied the motion to strike as to Sklar's causation testimony and granted the motion to strike as to his testimony about the reasonableness and necessity of the Castros' past medical expenses:

> The designation indicates that Dr. Sklar is expected to give opinions with regard to the motor vehicle accident in question; that it was not a proximate cause of the personal injuries claimed by the plaintiff, intervenors, and claimants; and Dr. Sklar will be allowed to testify to that affect.

–41–

Because his previous affidavits were stricken, he will not be allowed to testify as to reasonableness and necessity of medical care and medical expenses. Dr. Sklar is also allowed to testify or to opine as to any pre-existing conditions and ordinary diseases of life, which were not proximately caused by the subject motor vehicle accident. That is the Court's opinion—or ruling on Dr. Sklar.

After the jury rendered its verdict, Ten Hagen filed a bill of exception and offer of proof attaching the deposition testimony that was excluded by the trial court.

**Analysis**

On appeal Ten Hagen argues that the trial court abused its discretion when it struck Sklar's counteraffidavits before trial. Ten Hagen argues that Sklar's "testimony and affidavit" were admissible because (1) he was qualified to opine on the reasonableness and necessity of the Castros' past medical expenses, and (2) his affidavits gave reasonable notice of the basis for controverting the Castros' claims. But with respect to why Sklar's counteraffidavits gave reasonable notice, Ten Hagen's argument is:

Dr. Sklar explained in detail the types of injuries they had, the usual amount of treatment required for such injuries, and the costs that would have been expected based on his experiences with these matters.

Ten Hagen supports this statement with one general citation to his counteraffidavits and curriculum vitae (spanning 40 pages in the clerk's record). Within those 40 pages there are a total of 25 numbered paragraphs under the headings "RECAP OF OPINIONS." Ten Hagen does not provide argument as to why these opinions gave the Castros reasonable notice of the bases for controverting the Castros' claims. In addition, the Castros' motion raised a third ground for striking Sklar's counteraffidavits that Ten Hagen does not address—namely that the counteraffidavits exceeded the scope of section 18.001 because they mostly addressed causation as opposed to reasonableness and necessity. *See generally Douglas v. City of Kemp*, 05-14-00475-CV, 2015 WL 3561621, at *3 (Tex. App.—Dallas June 9, 2015, no pet.) ("If an appellant does not challenge all possible grounds, we must affirm the ruling on the unchallenged

–42–

ground."). For these reasons, we are unable to conclude that the trial court abused its discretion by striking Sklar's counteraffidavits.

Ten Hagen also argues that the trial court abused its discretion by excluding Sklar's testimony at trial concerning the reasonableness and necessity of the Castros' past medical expenses solely because his counteraffidavits had been struck. Stated differently, Ten Hagen argues that striking Sklar's counteraffidavits was not a proper basis for the trial court to exclude Sklar's testimony at trial.

To support its argument, Ten Hagen relies on two cases. First, Ten Hagen cites *Gutierrez* for the proposition that a defendant who does not serve a counteraffidavit is not "precluded from introducing evidence controverting the reasonableness and necessity of a plaintiff's medical bills and treatment." *See Gutierrez*, 2008 WL 5392023, at \*12. *Gutierrez*, however, does not stand for that proposition.

In *Gutierrez* our sister court recognized that evidence contravening the affidavits is properly excluded in the absence of a timely filed[15] counteraffidavit, but held that a defendant who does not file a counteraffidavit may nevertheless make "*arguments* contesting affidavits of reasonable and necessary expenses" during opening statements and closing arguments. *Id.* (emphasis added). It did not hold that a defendant could present its own expert witness at trial to controvert those matters in the absence of a counteraffidavit. *See id.*

Second, Ten Hagen cites *Grove v. Overby*, No. 03-03-00700-CV, 2004 WL 1686326, at \*6 (Tex. App.—Austin July 29, 2004, no pet.) (mem. op.). As with *Gutierrez*, however, *Grove* does not support the proposition that a defendant who does not serve a counteraffidavit can introduce expert testimony at trial to controvert the claimant's section 18.001 affidavit.

---

[15] Prior to 2007, section 18.001 required affidavits and counteraffidavits to be filed in the trial court. In 2007, section 18.001 was amended to require that affidavits and counteraffidavits be *served*, rather than *filed*—but one reference to "filed" inadvertently remained and was not removed and replaced with "served" until 2013. Because the arguments in this case do not implicate the most recent amendment to the statute, we refer to the current version in this opinion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(a)–(b).

In *Grove*, the trial court allowed the defendant, who had not filed a counteraffidavit, to cross-examine the plaintiff about his injuries and prior medical condition and introduce copies of some of the plaintiff's medical records showing the plaintiff's medical history. *Id.* The *Grove* court said that the trial court did not abuse its discretion by doing so because a claimant's section 18.001 affidavit did not establish "conclusive evidence of the reasonableness or necessity of the charges or of causation of the corresponding injuries." *Id.* But the defendant in that case did not seek to offer its own expert's testimony to controvert the claimant's section 18.001 affidavit. *See id.*

In short, we do not agree that *Gutierrez* or *Grove* supports the proposition that Ten Hagen was entitled to introduce Sklar's expert testimony at trial to controvert matters contained in the Castros' section 18.001 affidavits after Sklar's counteraffidavits were struck.

One of the purposes of a section 18.001 affidavit is that it "provides for exclusion of evidence to the contrary, upon proper objection, in the absence of a properly-filed counteraffidavit." *Beauchamp*, 901 S.W.2d at 749. As a result, and in the absence of a proper counteraffidavit, we cannot say that the trial court abused its discretion when it excluded Sklar's trial testimony controverting the Castros' section 18.001 affidavits. *See generally Haygood v. De Escabedo*, 356 S.W.3d 390, 399 (Tex. 2011) (noting section 18.001 provides "for any dispute over reasonable and necessary expenses to be teed up by affidavit").

We resolve this issue against Ten Hagen.

### CONCLUSION

We conclude that the trial court properly instructed the jury that Ten Hagen was Ross's statutory employer at the time of the accident. We also conclude that the evidence is legally sufficient to support the findings that (1) Ross was acting in the scope of his employment at the time of the accident, (2) Ross's negligence alone caused the accident, (3) $150,000 would fairly

and reasonably compensate Lorena for her past physical pain and mental anguish, and (4) $10,911.13 would fairly and reasonably compensate Lorena for her past medical care expenses. Finally, we conclude that the trial court did not abuse its discretion when it excluded the testimony of Ten Hagen's rebuttal medical expert concerning the reasonableness and necessity of Lorena's past medical expenses.

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

150902F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TEN HAGEN EXCAVATING, INC., Appellant

No. 05-15-00902-CV     V.

JOSE CASTRO-LOPEZ AND LORENA CASTRO, Appellees

On Appeal from the County Court at Law No. 1, Dallas County, Texas
Trial Court Cause No. CC-11-00454-A.
Opinion delivered by Justice Lang-Miers.
Justices Francis and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Jose Castro-Lopez and Lorena Castro recover their costs of this appeal from appellant Ten Hagen Excavating, Inc.

Judgment entered this 29th day of August, 2016.