Opinion issued November 21, 2017



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00112-CV

————————————

## ROBERTA BENSON, Appellant

## V.

## FRED CHALK, INDIVIDUALLY, AND STEVE CHALK, INDIVIDUALLY AND AS NEXT FRIEND OF DRUCILLA HENKHAUS, Appellees

---

On Appeal from the 129th District Court
Harris County, Texas
Trial Court Case No. 2011-27959

---

## O P I N I O N

Appellant, Roberta Benson, challenges the trial court's judgment, entered after a jury trial, in the suit for negligence and wrongful death[1] brought against her by appellees, Fred Chalk, individually, and Steve Chalk, individually and as next friend of Drucilla Henkhaus (the "Chalks"). In six issues, Benson contends that the trial court erred in admitting a video recording of an out-of-court experiment and excluding impeachment testimony, eyewitness statements contained in a law enforcement collision report and investigation file, and testimony on causation.

We affirm.

## Background

In their third amended petition, the Chalks alleged that on July 7, 2010, a red Nissan minivan, driven by Mary Herron-Anders ("Anders"),[2] collided with a black Lexus sedan, driven by Benson, at the intersection Apple Tree Road and Wilcrest Drive (the "intersection"), which was controlled by a traffic signal. Anders's passenger, Drusilla Henkhaus (the "decedent"), the mother of Fred and Steve Chalk, sustained severe internal injuries in the collision and later died. According to the Chalks, Benson failed to use ordinary care by entering the intersection in disregard of a red traffic light, not controlling the speed of her car, and not keeping a proper

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.001–.012 (Vernon 2008 & Supp. 2016).

[2]    The Chalks non-suited Anders, who died prior to trial, and the trial court dismissed her from the case.

2

lookout and timely applying her brakes. And Benson's failure to use ordinary care proximately caused the decedent's death. The Chalks sought actual damages and damages for their loss of companionship and their mental anguish.

Benson filed an answer, generally denying the allegations and asserting that the collision was instead caused by the negligence of Anders.

At trial, Benson testified that she lives on Apple Tree and is familiar with the traffic signal at the intersection. At 7:50 p.m. on July 7, 2010, she drove her Lexus sedan east down Apple Tree toward the intersection. Benson "remember[ed] seeing the light green," but could not recall her location on Apple Tree when she noticed it. However, she was "near the intersection" when she looked up and saw the green light and "the light was green when [she] got there." Benson noted that there was not another motorist in front of her on Apple Tree and "there were stopped cars" in the southbound lanes of Wilcrest, although she initially stated that there were no such cars there. As she entered the intersection, she looked to her left and "glanc[ed] to her right." As Benson traveled across Wilcrest, she heard a "bam"; she was suddenly on a curb, with the passenger side of her car "smashed in." Although she initially told a law enforcement officer at the scene that she "thought" she had the green light, she "24 hours later," after having "calmed down," became "certain" that she had the green light.

In her deposition, which was presented to the jury, Anders testified that at approximately 7:00 p.m. on July 7, 2010, while it was daylight, but rainy, she drove her Nissan minivan in the left lane of the two northbound lanes of Wilcrest. Although trees lined the sides of the roadway, "they were not obstructing the light" and she had a clear view of the traffic signal at the intersection of Apple Tree. As she approached the intersection, the traffic light was green, and it stayed green. Her passenger, the decedent, suddenly said, "The car is not stopping." Anders then saw Benson's Lexus sedan for only a "split second," and she swerved to try to avoid a crash. After the collision, the decedent said that she smelled smoke, her stomach hurt, and she felt nauseous. She got out of the minivan, laid on the grass, and was later transported by ambulance to a hospital.

Dr. Charles Aramburo, a trauma surgeon at Memorial Hermann Hospital, testified that he was the decedent's admitting physician. When she arrived at the hospital, the decedent was unresponsive and never regained consciousness. She suffered a ruptured spleen and liver, and subsequently died. During Aramburo's testimony, the trial court admitted into evidence the decedent's medical records and certificate of death, which reflects that she died from "blunt force injuries."

April Yergin, the Chalks' expert witness on traffic-collision reconstruction, testified that she has a bachelor's degree in aeronautical engineering, attended classes at Northwest Traffic Institute, has twenty years of experience in

4

traffic-collision reconstruction, and investigates 150 to 200 traffic collisions per year. In this case, she examined records of the City of Houston Department of Public Works and Engineering ("the Department") to determine how the traffic-light sequence at the intersection was programmed. She then went to the intersection, observed the flow of traffic and function of the traffic lights, and compared the light sequencing against the Department's records. She saw that the traffic lights controlling Wilcrest at the intersection remain green at all times unless a motorist approaches on Apple Tree. Sensors mounted on the traffic lights regularly cycle, periodically looking for changes in pixilation on Apple Tree. When a change is detected, the traffic signal on Wilcrest begins to cycle to red to allow traffic on Apple Tree to pass through the intersection.

Yergin conducted an out-of-court "experiment" to depict the sequencing and timing of the traffic lights at the intersection. Noting that the collision occurred on July 7, 2010 at 7:55 p.m., she, in January 2013, went to the intersection at approximately 7:00 p.m., staying until 8:30 p.m. Yergin observed how the traffic flowed and noted the duration of each signal light. She then had her assistant, from different directions and speeds, drive through the intersection several times. Yergin made video recordings of the signal lights controlling traffic eastbound on Apple Tree, as Benson had traveled at the time of the collision, and northbound on Wilcrest, as Anders had traveled at the time of the collision. Yergin explained that "[i]n every

5

scenario," in order to trigger the signal lights controlling Wilcrest to begin cycling to red, a motorist traveling eastbound on Apple Tree and approaching the intersection had to "stop or come within a mile per hour" in front of the signal light on Apple Tree. She noted that while at the intersection, she did not see any motorist simply "catch a green light" on Apple Tree, unless another motorist happened to be traveling in front of them.

Yergin further testified that the video recordings fairly and accurately depict the functioning of the traffic signals at the intersection and, based on the Department's timing charts, the light sequencing at the time she was at the intersection was the same as that at the time of the collision. Further, the timing listed in the charts matched what she observed at the intersection. Although the collision occurred during daylight hours in the month of July and she conducted her experiment after dark in the month of January, Yergin noted that the "lighting conditions [were] not an issue." Rather, the issue was the timing of the lights, which, according to the Department's records, had not changed.

During cross-examination, Yergin explained that the Department's records do not differentiate between months; rather, they differentiate between days of the week. And because the collision occurred on a Wednesday, she visited the intersection on a Wednesday. Yergin also explained that once triggered, the traffic light on Apple Tree remained green for only five seconds, then turned yellow for

6

three and one-half seconds, and then turned red. The traffic light on Wilcrest would then turn green after a one-and-one-half-second lag. Yergin noted that the timing of the traffic light remained the same regardless of whether it was daytime or nighttime and its camera detected images within 50 to 150 feet of its sensor. She further explained that the sensor could not be triggered by headlights alone:

> I'm not sure exactly how that particular camera picks up objects. It has to do with visual pix[i]lization. I would assume at night it's looking at lights, but headlights can be seen for a long distance. So, you wouldn't want it to trigger when a car is, say, you know, 300 feet away because then it would have to wait for 10, 15, 20 seconds for that car to get there. So, I believe it has some sort of visual ability to see at night . . . .

Yergin did note that during her experiment, the reflective vest that she was wearing appeared to have triggered the traffic light on Apple Tree to change. She also noted, however, that there was not a cross-walk or pedestrian signals at the intersection, it was not a pedestrian-friendly area, and there had been no mention in this case of any pedestrians in the area at the time of the collision.

The Chalks offered as a "demonstrative exhibit" three, thirty-minute video recordings of Yergin's out-of-court experiment. Benson objected to the admission of the video recordings on the ground that they are more prejudicial than probative, in that the lighting conditions depicted are not substantially similar to those that occurred at the time of the collision. Benson asserted that Yergin had failed to explain to the jury how the lighting conditions affected the sensor's pixel detection

7

and, thus, the triggering of the light. The trial court admitted the video recordings as "demonstrative exhibit[s]" and portions were played for the jury.[3]

Prior to trial, Benson had informed the trial court that she intended to present to the jury the deposition testimony of Cindy Maddox, who witnessed the collision; Houston Police Department ("HPD") Officer M. Hroch, who was dispatched to the scene of the collision; and HPD Officer A. Michon, who investigated the collision. The trial court sustained the Chalks' objections, discussed below, to the admissibility of certain portions of the depositions. Benson then presented to the jury excerpts of the remaining portions of the deposition testimony.

In her videotaped deposition, Maddox testified that "right before the collision," she was driving her car on Wilcrest "[a]bout 400 feet" behind Anders's red minivan. Maddox was not focused on the minivan or on Benson's car when it entered the intersection. She noted that trees along both sides of the street were "really overgrown" to the point that they obstructed a clear view of the traffic signal at the intersection. When asked whether she could "say whether it's more likely than not that the light controlling [her] lane of traffic was red or green at the time of the collision," she responded, "I don't know." At the scene, Maddox had given to Benson an envelope, on which Maddox had written her name and telephone number, and the trial court admitted it into evidence.

---

[3]     These videotape recordings were not made part of the appellate record.

In his deposition, which was read into the record, Officer Hroch testified that at the time of the collision, he had been a law enforcement officer for approximately three years and had attended a "basic accident course." On July 7, 2010, he was dispatched to investigate the collision. He noted that Benson, Anders, and the decedent were "shaken up" and it would not have been unusual for a driver to use the word, "thought," "with regard to the [color of the] light they had."

In his deposition, which was read into the record, Officer Michon testified that at the time of the collision, he had been a police officer for approximately one year, attended two weeks of "accident investigation" training, and been assigned to HPD's Vehicular Crimes Division for five weeks. After he was assigned to investigate the collision, he interviewed both drivers and Maddox. Michon established that Maddox actually witnessed the collision. When asked his impression of whether Anders had seen the traffic light, he responded, "I did not believe that she had seen the light. I believe that she was relying more on her passenger." The trial court admitted into evidence redacted versions of the HPD "crash report" and "accident records."

Before the trial court read its charge to the jury,[4] Benson made an offer of proof regarding the excluded portions of the deposition testimony of Maddox and Officers Hroch and Michon. In the proffered portion of Maddox's deposition testimony, she admitted that she had originally, at the scene, told Officer Hroch that

---

[4] *See* TEX. R. EVID. 103(c).

9

Anders's "van ran the red light and caused the accident." Maddox also admitted that eight days after the collision, she, in a recorded interview with an insurance adjuster, had stated:

> As I was coming home, . . . I was about three car lengths behind this red van. I saw the light in front of me, and the light in front of the red van turned red and I started slowing down and I then, of course—that we had the red light, I saw the other—the dark car come off of [Apple Tree] like she would have for a green light, and I saw her coming out and I didn't see that red van put on brake lights or anything, and I knew instantly that the van just didn't see the red light, and then I just saw her broadside or hit that dark car coming off of [Apple Tree].
>
> . . . .
>
> There is absolutely no doubt in my mind that the light was red because I thought—because when I saw that dark car, I said, oh, my God, she's going to—that van is going to hit that car because I never saw any brake lights on the van, so I knew that the van just did not, somehow, for some reason, did not see, did not pay attention to that red light. I mean, it was red. You know, I saw it red and that's—I was shocked that the van didn't stop.

Maddox further admitted that several weeks after the collision, she told Officer Michon that she was "about four car lengths behind the red van" and there was "no doubt that the van had the red light and ran the red light."

In the proffered portion of his deposition testimony, Officer Hroch noted that he had arrived at the scene approximately ten minutes after the collision. He described the positions of automobiles, the drivers, and a passenger. Hroch blocked off the street from other motorists, gathered information from the drivers, summoned tow trucks, observed the functioning of the signal light, and confirmed that it was

10

functioning properly, "as red and green opposite." He noted that there was nothing obscuring the views of the traffic signals. And Hroch explained that "closer to the beginning of [his] arriving on scene," Maddox walked up to him, stated that she saw the collision, and provided a statement, which Hroch recorded in the collision report. Maddox told Hroch:

> I was driving north on Wilcrest and I was behind the red van. I began to slow down because we had a red light and the van just drove right through the intersection and did not even slow down. The van ran the red light and caused the accident.

Hroch noted that Maddox was the sole independent witness at the scene and "seemed sure." Based on her statement, Hroch opined that Anders had caused the collision.

In the proffered portion of his deposition testimony, Officer Michon noted that on September 30, 2010, he met with Maddox, who provided a handwritten statement as follows:

> As I was nearing the Apple Tree intersection I saw the light was red and started putting on my brakes. I was about four car lengths behind the red van and saw that the driver wasn't braking. I saw a dark car pull out into the intersection and said to myself, "Oh no the van is going to hit that car." That is what happened. I grabbed my cell and called 911 as I was parking my car to assist. There is no doubt that the van had the red light and ran the red light.

Based on Maddox's statement, Michon opined that Anders ran a red light and caused the collision.

The jury found that the negligence of both Benson and Anders proximately caused the collision. It attributed eighty percent of the liability to Benson and twenty

11

percent to Anders. It awarded Fred and Steve Chalk each damages in the amount of $300,000 for past and future loss of companionship and mental anguish. And the jury awarded the decedent damages in the amount of $25,000 for physical pain, $10,000 for mental anguish, and $5,000 for funeral and burial expenses. The trial court entered a judgment on the verdict.

## Standard of Review

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). We will uphold a trial court's evidentiary ruling if any legitimate ground supports the ruling, even if the ground was not raised in the trial court. *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.–Houston [14th Dist.] 2006, pet. denied). And we will not reverse an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment or prevented a proper presentation of the appeal. *See* Tex. R. App. P. 44.1(a); *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 474 (Tex. 1998). In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record, and, "[t]ypically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to

12

demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). Ordinarily, we will not reverse a judgment because a trial court erroneously excluded evidence if the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

**Statements in Collision Report and Investigation File**

In her first and fourth issues, Benson argues that the trial court erred in excluding from evidence Maddox's statements, contained in the HPD collision report and investigation file, that Anders ran the red light because the statements are admissible under the exceptions to the hearsay rule for prior witness statements and present sense impressions. *See* TEX. R. EVID. 801(e)(1), 803(1).

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible except as provided by the rules of evidence or some other statute. TEX. R. EVID. 802. The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

The parties do not dispute that the collision report and investigation file meet the public records exception to the hearsay rule. *See* TEX. R. EVID. 803(8).

13

However, they dispute the admissibility of Maddox's statements contained within the report and file. Hearsay within hearsay is not admissible unless each part of the combined statements conforms with an exception to the general rule excluding hearsay. *See* TEX. R. EVID. 805; *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 782 (Tex. App.—Dallas 2005, pet. denied); *Knox v. Taylor*, 992 S.W.2d 40, 64 (Tex. App.—Houston [14th Dist.] 1999, no pet.). When a police report contains a hearsay statement, the statement must fall under some hearsay exception of its own because neither the public records and reports exception, nor the records of regularly conducted activities exception, protects hearsay within hearsay. *See Kratz v. Exxon Corp.*, 890 S.W.2d 899, 905 (Tex. App.—El Paso 1994, no pet.).

Benson first asserts that Maddox's statements, contained in both the collision report and investigation file, are admissible as a declarant-witness's prior statement. *See* TEX. R. EVID. 801(e)(1)(A). Rule 801(e)(1)(A) provides an exemption to the hearsay rule providing, in pertinent part, as follows: A declarant's prior statement is not hearsay if she "testifies and is subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony, and . . . was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." *Id.* Here, Maddox's statements at issue, which are those contained in the collision report and investigation file, were made at the scene to Officer Hroch

14

and during a subsequent interview with Officer Michon.  Because her statements to the officers were not made under oath, the exception does not apply.  *See id.*

Benson next asserts that Maddox's statement, contained in the collision report,[5] is admissible as a present sense impression.  *See* TEX. R. EVID. 803(1).  A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *Id.*  Present sense impressions possess the following safeguards which make them likely to be true and thus admissible: (1) the report at the moment of the thing then heard, seen, etc. is safe from any error from defect of memory of the declarant; (2) there is little or no time for calculated misstatement; and (3) the statement will usually be made to another—the witness who reports it— who would have equal opportunity to observe and check a misstatement.  *First Sw. Lloyds Ins. Co. v. MacDowell*, 769 S.W.2d 954, 958–59 (Tex. App.—Texarkana 1989, writ denied).

Again, the proponent of hearsay has the burden of showing that the complained-of statement fits within an exception to the general rule prohibiting the admission of hearsay evidence.  *See Ramirez*, 159 S.W.3d at 908 n.5.  To preserve error for our review, an appellant's complaint on appeal must comport with her

---

[5]     We treat this portion of Benson's issue as applying only to Maddox's statement contained in the collision report because the record shows that she made the statement contained in the investigation file several weeks after the collision.

objection in the trial court. *See* TEX. R. APP. P. 33.1(a); *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 621 & n.21 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Benson does not direct us to any point in the record in which she asserted in the trial court that Maddox's statement, contained in the collision report, constitutes a present sense impression. Thus, her stated ground for admission in the trial court does not comport with her ground raised on appeal, and error, if any, is waived. *See Taylor*, 132 S.W.3d 613, 621 & n.21; *see, e.g.*, *McKee v. McNeir*, 151 S.W.3d 268, 270 (Tex. App.—Amarillo 2004, no pet.) (proponent of evidence waived complaint trial court erred in excluding evidence because proponent's stated ground for admission at trial failed to comport with ground raised on appeal); *Butler v. Comm'n for Lawyer Discipline*, 928 S.W.2d 659, 665 (Tex. App.—Corpus Christi 1996, no writ) (argument trial court erred in excluding hearsay testimony on ground witness's response went to state of mind waived because defendant did not urge "state of mind" hearsay exception at trial).

Accordingly, we hold that the trial court did not err in excluding from evidence Maddox statements contained in the HPD collision report and investigation file.

We overrule Benson's first and fourth issues.

16

**Prior Inconsistent Statements**

In her third issue, Benson argues that the trial court erred in excluding from evidence the portions of Maddox's deposition testimony in which she admitted making prior inconsistent statements to Officers Hroch and Michon and to the insurance adjuster, i.e., that Anders drove through a red light, because the rule that a witness may not be called solely for purposes of impeachment applies only in criminal, and not in civil, cases. *See* TEX. R. EVID. 613(a). She further asserts that Maddox's prior inconsistent statements are admissible as substantive evidence.

"Any party, including the party that called the witness, may attack the witness's credibility." TEX. R. EVID. 607. A party may impeach a witness with evidence of prior inconsistent statements. TEX. R. EVID. 613(a). However, only those prior inconsistent statements made under the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, are considered non-hearsay and may be used. TEX. R. EVID. 801(e)(1)(A)(i). Because "most prior inconsistent statements are . . . classified as hearsay, the danger remains that a litigant will call a witness[,] whom it knows (or strongly suspects) will testify unfavorably," and impeach the witness with a prior inconsistent statement, "with the hope that the jury will improperly use the prior statement for its truth." 1 Steven Goode, et al., *Texas Practice Series: Guide to the Texas Rules of Evidence: Civil and Criminal* § 607.2 (4th ed. 2016). Thus, with "near unanimity," courts have held that "some restrictions

must be placed on a party's ability to impeach its own witness with prior inconsistent statements." *Id.* ("[C]ourts have wrestled with the task of reconciling the terms of Rule 607, which seems to abandon all restrictions on impeaching one's own witness, and the continued hearsay status of most prior inconsistent statements."). "Regardless of their analytical approach," courts have reached the same conclusion: "[A] party may not impeach its own witness if its primary purpose is merely to the get the witness's prior inconsistent statement before the jury." *Id.*; *see also Barley v. State*, 906 S.W.2d 27, 37 n.11 (Tex. Crim. App. 1995) ("[T]he majority of jurisdictions still do not allow prior inconsistent statements to be used under the guise of impeachment for the primary purpose of placing substantive evidence before the jury which is not otherwise admissible.").

Although the language of rule 607 is the same for both civil and criminal cases, civil cases interpreting rule 607 in the instant context are limited. Thus, we look to analogous criminal cases for guidance in interpreting rule 607. *See* TEX. R. EVID. 101(b) ("These rules apply to proceedings in Texas courts . . . ."); *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 146 (Tex. 2012) ("More than a century ago, this Court noted that 'there are criminal cases which may incidentally involve a question of civil law, and civil cases in which in like manner points of criminal law call for solution.'" (quoting *Comm'rs' Court v. Beall*, 98 Tex. 104, 81 S.W. 526, 528 (1904))); *Tex. Dep't of Transp. v. Pate*, 170 S.W.3d 840, 850 (Tex. App.—

Texarkana 2005, pet. denied) (applying criminal cases in construing Texas Rule of Evidence 607); *see also McNeel v. Citation Oil & Gas Corp.*, 526 S.W.3d 750, 756 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[W]hen there is no binding precedent, Texas courts also look to federal law and federal cases for guidance in situations . . . in which the language of the [state statute] and the analogous federal statute contain the same or substantially similar language."); *cf. McQuarrie v. State*, 380 S.W.3d 145, 152–53 (Tex. Crim. App. 2012) (considering civil cases interpreting former rules of civil evidence as persuasive authority for interpreting rules of evidence in criminal case); *Roise v. State*, 7 S.W.3d 225, 234 n.3 (Tex. App.—Austin 1999, pet. ref'd) (because Texas Rule of Evidence 702 is "equally applicable to both Texas civil and criminal cases," "Texas civil cases . . . may be looked to for guidance" in "a Texas criminal case").

In *Hughes v. State*, Child Protective Services ("CPS") investigators stated that the defendant's wife had told them that the defendant had admitted to having sexually abused his step-daughter. 4 S.W.3d 1, 2 (Tex. Crim. App. 1999). Subsequently, at a pre-trial hearing, the wife denied having told the investigators about any such admission by the defendant. *Id.* at 2–3. At trial, the State called the wife, who again denied having made such statements to the investigators. *Id.* at 3. The State then called one of the CPS investigators to impeach the wife's testimony. *Id.* On appeal, the defendant argued that the trial court erred in admitting the

impeachment testimony because the State called his wife for the sole purpose of impeaching her with otherwise inadmissible hearsay, knowing prior to calling his wife to testify that she would deny having told the investigators about his admission. *Id.* at 2, 4–5. The defendant asserted that the State's right to impeach its own witness under rule 607 did not "extend to employment of such impeachment as a mere subterfuge to get otherwise inadmissible hearsay evidence before the jury." *Id.* at 3.

The Texas Court of Criminal Appeals explained that in *Barley v. State* it had observed that although a showing of "surprise" or "injury" is no longer required for a party to impeach its own witness under rule 607, there did appear to be "a growing distinction" among the courts as to whether the State was aware, prior to calling its witness at trial, that the witness would testify unfavorably. *Id.* at 4 (citing 906 S.W.2d 27, 38 n.11 (Tex. Crim. App. 1995)). Specifically, in those cases in which courts had refused to admit prior inconsistent statements under the guise of impeachment, "it was obvious the State's primary intent in calling the witness was to introduce inadmissible hearsay." *Id.* (citing *Barley*, 906 S.W.2d at 38 n.11). However, in cases in which there was not a "clear showing that the State was aware [that its] witness would testify unfavorably, the trend seemed to be 'an analysis conducted in the context of a Rule 403 balancing approach.'" *Id.* Some courts of appeals, however, had interpreted *Barley* as creating an exception to rule 607 where

20

the State was aware, or should have been, that its witness would testify unfavorably. *Id.*

In *Hughes*, the court of criminal appeals concluded that "the State's knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403." *Id*. at \*5. Under a rule 403 balancing test, the impeachment evidence "must be excluded" where the State "profits from the witness's testimony only if the jury misuses the evidence by considering it for its truth." *Id.* Under such circumstances, "any probative value the impeachment testimony may have is substantially outweighed by its prejudicial effect."[6] *Id.*

Further in *Hughes*, the court of criminal appeals concluded that, in the case before it, the State had not offered any explanation as to why it had expected the wife to testify differently at trial than she had during the pretrial hearing. *Id.* at 7.

---

[6]     When a party calls a witness knowing that the witness will provide no useful testimony and then adduces a prior inconsistent statement, it must be doing so in the hope that the jury will make substantive use of the prior statement. If the jury used the evidence properly (that is, for impeachment purposes only), the best the party can do is to neutralize the witness's testimony. . . . The party can profit from calling the witness only if the jury misuses the evidence by considering it for the truth of the matter asserted. In this situation, the prejudicial value of adducing the prior inconsistent statement must outweigh its probative value.

*Ramirez v. State*, 987 S.W.2d 938, 944 (Tex. App.—Austin 1999, no pet.) (quoting 1 Steven Goode, et al., *Texas Practice Series: Guide to the Texas Rules of Evidence: Civil and Criminal* § 607.2 (4th ed. 2016)).

And an examination of the record revealed that, during trial, the State elicited "no favorable testimony" from the wife. *Id.* The court concluded that the "lack of favorable testimony suggest[ed] that the State was attempting to use [the wife's] prior inconsistent statements under the guise of impeachment, for the primary purpose of placing before the jury evidence which was not otherwise admissible." *Id.* And the State had "little, if any, legitimate purpose in admitting [the wife's] prior inconsistent statements to impeach her testimony." *Id.* "[D]ue to the highly prejudicial nature" of the defendant's confession, "any probative value it may have had [as impeachment evidence] was substantially outweighed by its prejudicial effect." *Id.* Thus, the trial court erred in "failing to exclude the impeachment evidence under rule 403." *Id.*

Similarly, in *Aguilar v. State*, the court of appeals held that the trial court erred in admitting impeachment testimony because its probative value was substantially outweighed by its prejudicial effect. No. 14-07-00362-CR, 2008 WL 5058974, at *1–2 (Tex. App.—Houston [14th Dist.] Dec. 2, 2008, no pet.) (mem. op., not designated for publication). There, a police officer stated that a witness told him that the defendant had admitted to shooting the complainant. *Id.* at *1. Subsequently, at a hearing outside the presence of the jury, the witness testified that he did not remember giving a statement to the officer. *Id.* The witness also later testified before the jury that he did not remember giving a statement to the officer.

22

*Id.* at *2. The State then impeached the witness with the officer's testimony. *Id.* On appeal, the defendant argued that the trial court erred in admitting the impeachment testimony because the State's sole purpose in calling the witness was to impeach him with inadmissible hearsay. *Id.* at *1–2. The court noted that although the witness's statement was admissible for impeachment purposes, the State "cannot call a witness that it knows will testify unfavorably for the sole purpose of impeaching that witness with otherwise inadmissible hearsay." *Id.* The court, applying a rule 403 balancing analysis, noted that the "key issue" was the State's prior knowledge that the witness would not testify favorably. *Id.* at *2 (citing *Hughes*, 4 S.W.3d at 3). The court held that the trial court erred in admitting the officer's testimony about the content of the witness's prior statement because the record showed that the State had learned prior to the witness testifying at trial that he did not remember giving the statement, the witness's testimony at trial was not favorable to the State, and the State did not expect that the witness would give favorable testimony. *Id.*

In contrast, this Court, in *Flores v. State*, held that a trial court did not err in admitting impeachment testimony. No. 01-10-00531-CR, 2013 WL 709100, at *22 (Tex. App.—Houston [1st Dist.] Feb. 26, 2013, pet. ref'd) (mem. op., not designated for publication). There, the State knew in advance of trial that the witness would testify unfavorably about whether she had heard police officers announce their presence and the witness, who was the only civilian witness to the events other than

23

the defendant, provided substantial evidence regarding the defendant's links to narcotics, firearms, and the events; however, the substance of the impeachment evidence, i.e., that the witness had, in fact, heard someone yell, "police," was also presented through the testimony of other witnesses. *Id.* at *21 (citing *Kelly v. State*, 60 S.W.3d 299, 302 (Tex. App.—Dallas 2001, no pet.) (because several other witnesses testified to substance of hearsay testimony used for impeachment, less risk testimony "would be misused by the jury")).

Similarly, in *Kelly*, the court of appeals concluded that the trial court did not err in admitting impeachment testimony because the prejudicial nature of the testimony did not substantially outweigh its probative value. 60 S.W.3d at 302. There, a State's witness testified that he did not see the defendant with a firearm on the day of the shooting and denied that he had previously told a detective otherwise. *Id.* at 300. The State then called the detective, who testified that the witness had said that he saw the defendant in possession of the firearm. *Id.* On appeal, the defendant argued that the trial court erred in admitting the detective's testimony because the State improperly called the witness for the sole purpose of impeaching him with otherwise inadmissible hearsay. *Id.* The court noted that the court of criminal appeals, in *Hughes*, had addressed "the problem of the State's calling a witness knowing full well she would not repeat her earlier incriminating statements and then following her with a State's witness who would provide the desired evidence via

24

hearsay." *Id.* at 301 (citing *Hughes*, 4 S.W.3d at 5). Applying a rule 403 balancing analysis, the court in *Kelly* concluded that the State had elicited no favorable testimony from the witness. *Id.* at 302. At most, the witness "merely confirmed that he denied" saying "anything helpful" to the detective. *Id.* However, other sources provided the critical evidence by means other than hearsay testimony; several other witnesses identified appellant as the shooter. *Id.* More important, nothing in the record suggested that the State knew that the witness would recant. *Id.* ("*Hughes* teaches us that prior knowledge is key.").

In *Texas Department of Transportation v. Pate*, one of the few civil cases to consider rule 607 in the present context, the court, although deciding the issue on the basis of waiver, noted, relying on *Barley* and *Hughes*, that "a party may not call a witness primarily for the purpose of impeaching him or her with evidence that would otherwise be admissible." 170 S.W.3d 840, 850 (Tex. App.—Texarkana 2005, pet. denied).

In *Truco Properties, Inc. v. Charlton*, a case that pre-dates *Barley* and *Hughes*, a defendant-employer asserted that the trial court erred in not admitting witness testimony about possible alternative causes of the plaintiff-employee's alleged on-the-job injury. 749 S.W.2d 893, 896 (Tex. App.—Texarkana 1988, writ denied). There, the employee's daughter testified outside the presence of the jury that she was unaware of any possible alternative causes of the alleged injury. *Id.* Subsequently,

25

although the employer had no expectation that the daughter would testify favorably, the employer attempted to call the daughter as a witness at trial. *Id.* The trial court, however, did not allow the employer to present the daughter's testimony. *Id.*

On appeal in *Truco*, the employer argued that because the trial court did not allow it to call the daughter as a witness at trial, it was unable to impeach her testimony with that of another witness, who would have testified that the daughter had told her that her mother, the employee, had fallen out of bed while drunk and hurt her back. *Id.* The court noted that the "question raised" by the employer was "whether the [daughter] may be called solely for the purpose of later impeachment by the use of otherwise inadmissible hearsay." *Id.* The court concluded that the trial court did not err in excluding the testimony because the employer was attempting to present inadmissible testimony "through the back door." *Id.*

Turning to the instant case, we again note that the decision to admit or exclude evidence lies within the sound discretion of the trial court. *See Bay Area Healthcare Grp., Ltd.*, 239 S.W.3d at 234. We will uphold a trial court's evidentiary ruling if any legitimate ground supports the ruling. *See Hooper*, 222 S.W.3d at 107. Relevant evidence is generally admissible. TEX. R. EVID. 402. A trial court may exclude relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *Farmers*

26

*Texas Cty. Mut. Ins. Co. v. Pagan*, 453 S.W.3d 454, 461 (Tex. App.—Houston [14th Dist.] 2014, no pet.).  Thus, a trial court balances the probative value of admitting a prior inconsistent statement for its legitimate impeachment purposes against the danger of unfair prejudice created by the jury misusing the statement for substantive purposes.  *Hughes*, 4 S.W.3d at 5.

Here, Benson first presented to the jury the portion of Maddox's deposition in which she testified that before the collision, she was driving "[a]bout 400 feet" behind Anders's red minivan; the trees lining the roadway were overgrown to the point that they obstructed a clear view of the traffic signal at the intersection; and she did not know whether the light controlling her lane of traffic was red or green at the time of the collision.  Benson then sought to present the portion of Maddox's deposition testimony in which she admitted to making the prior inconsistent statements contained in the HPD collision report and investigation file, and in her interview with the insurance adjuster, i.e., that before the collision, she was only three or four car lengths "behind the red van and saw that the driver wasn't braking"; "the van just drove right through the intersection and did not even slow down"; "[t]here [was] no doubt that the van had the red light"; and "the van ran the red light and caused the accident."

The Chalks objected to Benson presenting evidence of Maddox's prior inconsistent statements to the officers and insurance adjuster on the ground that

Benson had improperly called Maddox to testify by deposition for the sole purpose of impeaching her with otherwise inadmissible hearsay. They asserted that Benson "ultimately want[ed] to get into evidence" Maddox's prior inconsistent statements, which constituted hearsay, to the officers and insurance adjuster that Anders had run a red light. The Chalks further asserted that Benson could not use prior inconsistent statements under the guise of impeachment for the primary purpose of placing substantive evidence before the jury which constituted hearsay and was not admissible. The trial court sustained the objection and excluded the testimony.

The record shows that Maddox was the only eyewitness, other than the parties and the decedent, to the collision, and, thus, there were no other witnesses to offer an independent accounting of the events. Where there is "no other possible independent source of critical evidence, . . . admitting it for impeachment purposes pose[s] a significant risk [that] the information [will] be misused by the jury." *See Kelly*, 60 S.W.3d at 302.

The record also shows that at the time of trial, Benson already knew that Maddox, during her prior deposition, had recanted under oath her previously made statements to the HPD officers and the insurance adjuster that Anders had driven through a red light. Maddox did not appear and testify live at trial. Rather, Benson simply presented to the jury specific portions of Maddox's videotaped deposition testimony. Benson then attempted to impeach that testimony with other portions of

28

Maddox's deposition testimony.  Thus, this is not a case in which Benson could have expected that Maddox might give favorable testimony at trial or in which Benson could have tested at trial whether Maddox would adhere under oath to her prior recantation.  *See Hughes*, 4 S.W.3d at 3 ("key issue" in analysis is proponent's prior knowledge witness would testify unfavorably); *see also Kelly*, 60 S.W.3d at 302 ("*Hughes* teaches that prior knowledge is key.").

Further, as expected, the substance of Maddox's testimony at trial was not favorable to Benson's case.   Maddox testified that before the collision, she was "[a]bout 400 feet" behind Anders's red minivan, the trees lining the roadway were overgrown to the point that they obstructed a clear view of the traffic signal, and she did not know whether the light controlling her lane of traffic was red or green at the time of the collision.  *See Hughes*, 4 S.W.3d at 7 ("[L]ack of favorable testimony suggest[ed] [that] the [proponent] was attempting to use [the witness's] prior inconsistent statements under the guise of impeachment, for the primary purpose of placing before the jury evidence which was not otherwise admissible" and proponent had "little, if any, legitimate purpose in admitting [the witness's] prior inconsistent statements to impeach her testimony").

We conclude that based on the highly prejudicial nature of the portion of Maddox's deposition containing her prior inconsistent statements to the HPD officers and the insurance adjuster, any probative value it may have had as

29

impeachment evidence was substantially outweighed by its prejudicial effect. *See id*. at 3–5; *Pate*, 170 S.W.3d at 850; *cf. Aguilar*, 2008 WL 5058974, at \*1–2 (trial court erred in admitting prior inconsistent statement for impeachment purposes where witness's testimony at trial not favorable to proponent and proponent did not expect witness would give favorable testimony).

Benson further argues that the trial court erred in not admitting Maddox's prior inconsistent statements as *substantive* evidence because the jury had an opportunity to observe Maddox's demeanor in her videotaped deposition, Maddox admitted to having made the prior statements, and the "inherent reliability of the earlier statements' proximity in time to the accident, justify full admissibility."

"It is the well-settled rule in this State, and elsewhere, that prior inconsistent statements are usable only for impeachment purposes and are not substantive evidence of the facts stated." *Fultz v. First Nat. Bank in Graham*, 388 S.W.2d 405, 408 (Tex. 1965); *Spring Branch Bank v. Wright*, 404 S.W.2d 659, 665 (Tex. Civ. App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.) ("It is well settled that such prior inconsistent statements cannot be used as substantive evidence of the truth of the facts stated."); *see also Anthony Pools, a Div. of Anthony Indus., Inc. v. Charles & David, Inc*., 797 S.W.2d 666, 676 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (jury may not consider prior inconsistent statement as substantive evidence). We are bound by the precedent of the Texas Supreme Court and this Court.

30

Accordingly, we hold that the trial court did not err in excluding from evidence the portions of Maddox's deposition in which she testified about her prior inconsistent statements to Officers Hroch and Michon and to the insurance adjuster that Anders drove through a red light and caused the collision.

We overrule Benson's third issue.

## Causation

In her second issue, Benson argues that the trial court erred in excluding from evidence Officer Hroch's narrative in the HPD collision report and portions of both his and Officer Michon's deposition testimony, in which they opined that Anders caused the collision by entering the intersection against a red light, because "both officers were adequately qualified as experts on accident investigation and their opinions were reliable."

To establish causation in a negligence suit, a plaintiff must prove that the defendant's conduct caused an event and the event caused the plaintiff to suffer compensable injuries. *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 603 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Causation cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). However, proximate cause may be established by direct or circumstantial evidence and the reasonable inferences that may be drawn from that evidence. *Id.* at 903–04.

Generally, police officers, based on their position as police officers alone, are not qualified to render opinions regarding causation in collision cases. *Pyle v. Southern Pac. Transp. Co.*, 774 S.W.2d 693, 695 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *see also Lopez v. S. Pac. Transp. Co.*, 847 S.W.2d 330, 334 (Tex. App.—El Paso 1993, no writ). Police officers are qualified to testify about collision reconstruction if they are trained in the science and possess the high degree of knowledge sufficient to qualify as an expert. *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 891 (Tex. App.—Texarkana 2004, pet. denied).

For an expert's testimony to be admissible, the expert witness must be qualified to testify about "scientific, technical, or other specialized knowledge," and the testimony must be relevant and based upon a reliable foundation. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234–35 (Tex. 2010); *see also* TEX. R. EVID. 702. An expert's testimony is relevant when it assists the jury in determining an issue or in understanding other evidence. TEX. R. EVID. 702. However, expert testimony based on an unreliable foundation or flawed methodology is unreliable and does not satisfy the relevancy requirement. *Hughes*, 306 S.W.3d at 234–35 (citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex. 1995)).

Expert testimony is not required to establish negligence in a traffic-collision case if the question is not complex and not beyond the competence of an average juror. *See Smoak*, 134 S.W.3d at 893–94 (holding officer's lay opinion collision

32

caused by defendant's unsafe lane change legally sufficient to support jury's finding defendant seventy-five percent at fault for collision); *see also Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 485 (Tex. App.—Dallas 2016, pet. denied). "[N]ot every motor vehicle accident requires expert testimony to understand how it took place and who is at fault." *See Smoak*, 134 S.W.3d at 892. Lay evidence may establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010). Lay testimony is admissible if it is "(a) rationally based on the witness's perception and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." TEX. R. EVID. 701.

Here, Officer Hroch, in his deposition, testified that his "ultimate conclusion" that Anders drove through a red light was "based off of an independent witness that had no connection to either driver," i.e., Maddox, the sole surviving, independent witness. He explained that given Maddox's later statement, both in her affidavit and at her deposition, that she "really doesn't recall" whether Anders had the red light, his conclusion "would have been . . . no fault because [he] really couldn't tell who ran the red light." And "[s]ince he was not there, [he] would not be able to know if one [light] was green or red."

33

Officer Michon, in his deposition, testified that his conclusion that Anders drove through a red light and caused the collision was based "entirely upon the statement of [Maddox]." He explained that because the statements of Benson and Anders were conflicting as to which of them had the green light, he just "canceled those out." Because Michon was not there and did not see any "physical evidence that indicated which car ran the red light," he was unable to opine as to which driver, more likely than not, had caused the collision. He noted that given Maddox's later statement that she did not see the light on Wilcrest, he would have reported the cause of the collision as "undetermined."

Thus, even were we to conclude that Officers Hroch and Michon were qualified as experts to opine as to which driver drove through a red light at the intersection and caused the collision, the trial court could have reasonably concluded that their "opinions," which were not based on their own perceptions, but based entirely on Maddox's statement that Anders ran a red light and caused the collision, were without a reliable foundation. *See TXI Transp. Co.*, 306 S.W.3d at 234–35; *see also* TEX. R. EVID. 702.

Further, even were we to conclude, which we do not,[7] that the question of which driver ran the red light in this case was not complex and not beyond the

---

[7] *See, e.g.*, *Harris v. State*, 866 S.W.2d 316, 327 (Tex. App.—San Antonio 1993, pet. ref'd) (admitting expert testimony regarding which driver ran red light).

34

competence of an average juror and thus that expert testimony was not required to establish negligence, lay testimony is admissible only if it is rationally based on the witness's perception. *See* TEX. R. EVID. 701; *Smoak*, 134 S.W.3d at 893–94; *see also Ten Hagen Excavating, Inc.*, 503 S.W.3d at 485. Here, Officers Hroch and Michon testified that they based their stated opinions as to causation not on their own perceptions, but "entirely" on Maddox's statement that Anders had the red light.

Accordingly, we hold that the trial court did not err in excluding from evidence the portions of Officer Hroch's narrative in the collision report and portions of both his and Officer Michon's deposition testimony in which they opined that Anders drove through a red light and caused the collision.

We overrule Benson's second issue.

### Out-of-Court Experiment

In her fifth issue, Benson argues that the trial court erred in admitting into evidence video recordings of an out-of-court "experiment" because they were "simply not a true depiction of the actual conditions at the time of the accident." *See Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281–82 (Tex. 1964). She further argues that the video recordings lack probative value because they were not necessary to help the jury understand the traffic-light cycle. And Benson argues that the video recordings were prejudicial because they "most likely confused the

35

jury" and resulted in the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1.

"When an experiment is conducted out-of-court and in the absence of opposing counsel, there must be a substantial similarity between the conditions existing at the time of the experiment and the actual event that is the subject of litigation." *Lincoln v. Clark Freight Lines, Inc.*, 285 S.W.3d 79, 84 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Williams*, 375 S.W.2d at 281–82). However, the conditions need not be identical. *Id.* Where there exists a dissimilarity in the conditions, if the differences are minor or are explained to the jury, the admission of the experiment is within the trial court's discretion to determine whether the dissimilarity would cause the evidence to confuse rather than aid the jury and, thus, whether the evidence should be excluded. *Williams*, 375 S.W.2d at 282; *see also Sosa v. Koshy*, 961 S.W.2d 420, 430 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (no abuse of discretion where expert testified video substantially similar to conditions existing at time of collision and cross-examined about differences between video and actual event); *Garza v. Cole*, 753 S.W.2d 245, 247 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (no abuse of discretion where testimony explained differences between video and actual event); *cf. Lopez v. Foremost Paving, Inc.*, 796 S.W.2d 473, 481 (Tex. App.—San Antonio 1990, writ dism'd) (trial court erred in admitting video where it could have been perceived as

36

simulated re-enactment of collision and no explanation to jury of differences between experiment and actual events).

Again, an appellant, to obtain a reversal based on an error in the admission of evidence, must show that the trial court's ruling was erroneous and the error was calculated to cause and probably did cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *Interstate Northborough P'ship*, 66 S.W.3d at 220. The excluded evidence must be controlling on a material issue and not cumulative of other evidence. *See Williams Distrib. Co. v. Franklin*, 898 S.W.2d 816, 817 (Tex. 1995).

In *Garza*, a car driven by the defendant struck a car driven by the plaintiff at an intersection. 753 S.W.2d at 246. At trial, the jury viewed a videotape recording, presented by the defendant, of an out-of-court experiment depicting what the plaintiff "could have seen as she approached the intersection" where the collision occurred. *Id.* at 247. The defendant's videotape technician also testified in narrative form about the contents of the videotape recording. *Id.* On appeal, the plaintiff-appellant argued that the trial court erred in admitting the videotape recording because what it depicted was not substantially similar to the actual scene of the collision. *Id.* The Fourteenth Court of Appeals noted that even had it concluded that the trial court had erred in admitting the videotape recording, the error would have been harmless because the videotape recording was cumulative of

37

other testimony and evidence presented at trial. *Id.* at 248 (when trial court errs in "admit[ting] evidence of a nature that is largely repetitious" of other testimony, error is harmless).

Here, the material issue presented was whether the light was green when Benson entered the intersection. Benson testified that there was not another car ahead of her on Apple Tree and "the light was green when [she] got there." Yergin testified that based on her research of the signal lights controlling the intersection, "[i]n every scenario," in order to trigger the signal lights controlling Wilcrest to begin cycling to red, a motorist traveling eastbound on Apple Tree and approaching the intersection had to "stop or come within a mile per hour" in front of the signal light on Apple Tree. She noted that while at the intersection, she did not see any motorist simply "catch a green light" on Apple Tree, unless another motorist happened to be traveling in front of them. The trial court also admitted into evidence videotape recordings of Yergin's experiment, and Yergin further testified in detail about the contents of the videotape recordings as they were played to the jury.

The material evidence displayed in the videotape recordings, i.e., that in order to trigger the signal light controlling Wilcrest to begin cycling to red, a motorist traveling eastbound on Apple Tree and approaching the intersection had to stop or slow in front of the signal light, was cumulative of Yergin's testimony. Although

Benson objected to the admission of the videotape recordings, she did not object to Yergin's testimony about her experiment or the contents of the videotape recordings.

Thus, even were we to conclude that the trial court erred in admitting the videotape recordings, the error was harmless as the videotape recordings were cumulative of other testimony presented at trial. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906–07 (Tex. 2004) (any error in admission of videotape recording harmless where defendant did not object to other evidence, i.e., live testimony of witness about contents of videotape recording); *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 557 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) ("The erroneous admission of evidence that is merely cumulative of properly admitted evidence is harmless."); *Garza*, 753 S.W.2d at 248 (where trial court errs in "admit[ting] evidence of a nature that is largely repetitious" of other testimony, error harmless); *see also Gardner Oil, Inc. v. Chavez*, No. 12-10-00274-CV, 2012 WL 1623420, at *7–8 (Tex. App.—Tyler May 9, 2012, no pet.) (mem. op.) (any error in admitting video recording of out-of-court experiment harmless where plaintiff objected to admission of video recording, but not to expert's testimony, which was cumulative of evidence in recording).

We overrule Benson's fifth issue.

Having concluded that the trial court did not err in making its evidentiary rulings, we do not reach Benson's sixth issue, in which she asserts that the "trial court's errors, independently or cumulatively, require reversal.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

40